1

2

◆

Marquiz Law Office

Professional Corporation

◆

3     3088 Via Flaminia Court
      Henderson, NV 89052
4     Phone: (702) 263-5533
      Fax: (702) 263-5532
5     Craig A. Marquiz, Esq.
      NV Bar #7437
6     MarquizLaw@cox.net

7     Attorney for Plaintiffs

8

9                    **UNITED STATES DISTRICT COURT**

10                        **DISTRICT OF NEVADA**

11  JOSEPH O'SHAUGHNESSY, individually;     Case No.:
    MEL BUNDY, individually; JASON D.
12  WOODS, individually; DAVE BUNDY,
    individually; MARYLYNN BUNDY,
13  individually; BRIANA BUNDY, individually;
    BRETT ROY BUNDY, individually; MAYSA   **COMPLAINT**
14  LYNN BUNDY, individually; DALLY ANNE
    BUNDY, individually; BRONCO CLIVEN
15  BUNDY, individually; PAYTON ALMA
    BUNDY, individually; PIPER BODEL
16  BUNDY, individually; MONTANA BUNDY,
    individually; BENTLIE BUNDY, individually;
17  PRESLY BUNDY, individually; KYMBER
    BUNDY, individually; and ADAHLEN
18  BUNDY, individually,

19                    Plaintiffs,

20  v.

21  UNITED STATES OF AMERICA; DOES
    1 through 100; and ROES 1 through 100,
22  inclusive,

23                    Defendants.

24

25         Plaintiffs Joseph O'Shaughnessy, Mel Bundy, Jason D. Woods, Dave Bundy, Marylynn

26  Bundy, Briana Bundy, Brett Roy Bundy and the Bundy children (Maysa Lynn Bundy, Dally Anne

27  Bundy, Bronco Cliven Bundy, Payton Alma Bundy, Piper Bodel Bundy, Montana Bundy, Bentlie

28  Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy), through undersigned counsel,

Craig A. Marquiz, Esq. of the Marquiz Law Office, P.C., and for their claims against Defendant the United States of America ("UNITED STATES"), aver and allege as follows:

**JURISDICTION & VENUE**

1.      This Court possesses original subject matter jurisdiction over Plaintiffs' affirmative claims for relief pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), including, without limitation, exclusive jurisdiction of Plaintiffs' 28 U.S.C. § 1346 Federal Tort Claims Act ("FTCA") claims against the United States due to the negligent, wrongful acts and/or omissions of several federal employees who, while acting in the course and scope of their employment with their respective federal agencies, caused acts and events to occur within this forum under circumstances where the United States, if a private person, would be liable to Plaintiffs as detailed in 28 U.S.C. § 2674 and the laws of the State of Nevada where the Defendant's acts or omissions occurred.

2.      Venue of this matter is properly before this Court pursuant to 28 U.S.C. § 1391 as the underlying actions and corresponding damages occurred within this District and the United States is a named Defendant.

**PARTIES**

3.      Plaintiff Joseph O'Shaughnessy ("O'Shaughnessy") is, and at all times was, an Arizona domiciliary and citizen of the United States.

4.      Plaintiff Jason D. Woods ("Woods") is, and at all material times was, an Arizona domiciliary and citizen of the United States.

5.      Plaintiff Dave Bundy ("Dave Bundy") is, and at all material times was, a Utah domiciliary and citizen of the United States; married to Plaintiff Marylynn Bundy; and the father of Plaintiffs Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma Bundy and Piper Bodel Bundy.

6.      Plaintiff Mel Bundy ("Mel Bundy") is, and at all material times was, a Nevada domiciliary and citizen of the United States; married to Plaintiff Briana Bundy; and the father of Plaintiffs Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy.

2

7.      Plaintiffs O'Shaughnessy, Woods, Dave Bundy and Mel Bundy shall hereinafter be referred collectively to as the "Tier 2 Plaintiffs" for their wrongful status as criminal defendants in an egregious, fabricated and sham proceeding advanced by the UNITED STATES and its employees in the United States District Court for the District of Nevada in *United States v. Bundy et al.*, Case No. 2:16-cr-00046-GMN-PAL ("Underlying Action").[1]  Notably, in the Underlying Action, the UNITED STATES spent hundreds of millions of dollars in a multi-state effort to falsely convict Plaintiffs O'Shaughnessy, Woods, Dave Bundy and Mel Bundy of fabricated crimes purportedly dating back to 2014 and, to that end, forced Plaintiffs O'Shaughnessy, Woods, Dave Bundy and Mel Bundy to wrongfully endure twenty-three (23) months of incarceration and monitoring, mostly at a sweltering federal-contractor prison in Pahrump, Nevada.  During that time, Plaintiffs suffered severe emotional, physical, mental, occupational and financial distress – damages and injuries which continue to this day.

8.      Plaintiff Marylynn Bundy is, and at all material times was, a Utah domiciliary and citizen of the United States; married to Plaintiff Dave Bundy; and the mother of Plaintiffs Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma Bundy and Piper Bodel Bundy.

9.      Plaintiff Briana Bundy is, and at all material times was, a Nevada domiciliary and citizen of the United States; married to Plaintiff Mel Bundy; and the mother of Plaintiffs Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy.

. . .

. . .

---

[1]      In the Underlying Action, nineteen (19) Bundy defendants, including, without limitation, Plaintiffs O'Shaughnessy, Woods, Dave Bundy and Mel Bundy, were separated into three (3) distinct trial groups; namely, the "Tier 1" (the alleged "leadership" defendants); "Tier 2" (the claimed "mid-level leadership" defendants); and "Tier 3" (the alleged "gunmen") groups. Due to prosecutorial misconduct, including, without limitation, the intentional suppression of exculpatory evidence confirming, among other things, the innocence of the Tier 2 Plaintiffs, along with the government's knowing and intentional use of fabricated evidence to secure indictments against them, the first and only trial of the Tier 1 defendants was dismissed in January 2018.  Shortly thereafter, all charges against the Tier 2 group were dismissed based upon the United States own motion to dismiss their Superseding Indictments with prejudice.

10.     Plaintiff Brett Roy Bundy is, and at all material times was, a Utah domiciliary and citizen of the United States; and the oldest child, an adult son, of Plaintiffs Dave Bundy and Marylynn Bundy.

11.     Plaintiffs Maysa Lynn Bundy and Dally Anne Bundy, are, and at all material times were, Utah domiciliaries and citizens of the United States; and an adult and minor daughter, respectively, of Plaintiffs Dave Bundy and Marylynn Bundy.

12.     Plaintiffs Bronco Cliven Bundy, Payton Alma Bundy and Piper Bodel Bundy are, and at all material times were, Utah domiciliaries and citizens of the United States; and the minor sons of Plaintiffs Dave Bundy and Marylynn Bundy.

13.     Plaintiffs Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy are, and at all material times were, a Nevada domiciliaries and citizens of the United States; and the minor daughters of Plaintiffs Mel Bundy and Briana Bundy.

14.     Plaintiffs Marylynn Bundy, Briana Bundy, Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma Bundy, Piper Bodel Bundy, Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy shall hereinafter be referred to collectively as the "Bundy Family Plaintiffs."

15.     The Tier 2 Plaintiffs and the Bundy Family Plaintiffs shall hereinafter be referred to collectively as "PLAINTIFFS."

16.     Defendant UNITED STATES is the federal government and, through it various agencies (e.g., the DOJ, FBI, DOI and BLM, described more specifically below) and employees (i.e., Assistant United States Attorneys Nadia Ahmed, Steven Myhre and Daniel Bogden; FBI Special Agent Joel Willis; and BLM Special Agent in Charge ("SAC") Daniel P. Love, and Officers Rand Stover and Mark Brunk) - each of whom, for purposes of PLAINTIFFS' Federal Tort Claims Act ("FTCA") claims, was acting within her/his official capacity and within the scope and course of her/his employment with the applicable federal agency – caused acts and events to occur within this forum from which PLAINTIFFS' claims arose.

A.     The DOJ is, and at all material times was, an Executive Department and agency of Defendant UNITED STATES; responsible for the enforcement of law and the

administration of justice within the United States and doing business in this District; the administrator of several law enforcement agencies, including, without limitation, the FBI; and the employer of Assistant United States Attorneys ("AUSAs") Nadia Ahmed, Steven Myhre and Daniel Bogden (with Messrs. Myhre and Bogden, at certain times, each serving as the acting U.S. Attorney for the District of Nevada).

B.      The FBI is, and at all material times was, the investigative arm of Defendant UNITED STATES and DOJ; doing business in this District; and the employer of Special Agent Joel Willis.

C.      The DOI is, and at all material times was, an Executive Department and agency of Defendant UNITED STATES; responsible for the management and conservation of federal lands and natural resources through the BLM (the employer of Special Agent in Charge of the BLM's Gold Butte Cattle Impoundment Operation ("SAC") Daniel P. Love, and Officers Rand Stover and Mark Brunk) with both agencies doing business in this District.

17.     UNITED STATES employees Ahmed, Myhre, Bogden, Willis, Love, Stover and Brunk (each of whom caused acts and events to occur within this forum while acting in the scope and course of her/his employment with, and official capacities for, her/his respective federal agencies) shall hereinafter collectively be referred to as the "GOVERNMENT EMPLOYEES."

18.     Upon information and belief, Defendants identified as DOES 1 through 100 and ROES 1 through 100, whether individual, corporate, associate, governmental or otherwise, caused acts and events to occur within this forum from which PLAINTIFFS' claims arose.  The true names and capacities of these parties is not currently known by PLAINTIFFS, and once such identities become known, PLAINTIFFS will seek leave of Court to amend their Complaint accordingly.

## STATEMENT OF THE CASE

19.     PLAINTIFFS fully incorporate herein by reference all allegations contained in paragraphs 1 through 18 of this Complaint.

20.     Since the early 1850's (many years before Nevada as an unincorporated territory of the United States was admitted to the Union on October 31, 1864), ancestors of Plaintiffs

Dave Bundy, Mel Bundy and the Bundy Family (i.e., all members of the Church of Jesus Christ of Later Day Saints, "LDS"),[2] migrated to this territory and the Gold Butte area in Clark County, Nevada, ultimately securing deeds from the State of Nevada to land all along the Gold Butte region.

21. Upon that land, the Bundy family formed the Bundy Ranch as a living testimony of their family history, work ethic, pride and patriotism - a legacy which serves as an integral part of our American history and the development of the Great Basin region throughout the Western United States.

22. That legacy has been handed down from generation to generation with Plaintiffs Dave Bundy and Mel Bundy learning same from their father, Cliven Bundy, and their own hands-on experience working at the Bundy Ranch.

23. Plaintiffs Dave Bundy and Mel Bundy, in turn, have honorably passed on that same history, work ethic, pride and patriotism to their respective wives (Plaintiffs Marylynn Bundy and Briana Bundy) and their children (Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma Bundy, Piper Bodel Bundy, Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy).

24. Over the generations, the Bundy family has invested their blood, sweat, tears and considerable labor, materials and expense to improve the Bundy Ranch, including, without limitation, developing numerous artesian springs / aquifers on the Gold Butte mountain range, and securing title from the State of Nevada to the accompanying water rights.

25. Those springs, in turn, have served as a life force for the Bundy family's cattle that were lawfully grazing on the Bundy Ranch and its surrounding lands.

. . .

---

[2] Although the name "Mormon" has been used historically to refer to members of the LDS faith, the name is actually a derogatory term – one first coined by former Missouri Governor Boggs in the 1800s during the persecution of early LDS Church leaders and in furtherance of Governor Boggs Extermination Order.  That name, used repeatedly by the GOVERNMENT EMPLOYEES, is recognized as offensive by the LDS community and will be used throughout this pleading when attributable to the GOVERNMENT EMPLOYEES as evidence of their animus toward PLAINTIFFS and the LDS community.

6

26.     Upon information and belief, as part of an egregious plan to eliminate ranching operations within the region, divest or otherwise acquire the private water rights held by those ranchers, including, without limitation, the Bundy family, and to sell-off or otherwise lease those rights for commercial development or other land-use purposes, the DOI / BLM sought to wage economic and financial warfare against the ranchers by imposing restrictive grazing permits and fees, and limiting the number of cattle that could graze upon those lands.

27.     To that end, in 1998, the UNITED STATES through the DOJ and AUSA's Ahmed and Bogden initiated a civil suit against Cliven Bundy in the United States District Court for the District of Nevada, Case No. 2:98-cv-00531, seeking monetary damages for his refusal to obtain BLM grazing permits and pay the corresponding fees.  That action, *United States v. Cliven Bundy*, resulted in a $1 million judgment in favor of the UNITED STATES - a majority of which constituted fines, penalties and interest.

28.     Armed with that judgment, the GOVERNMENT EMPLOYEES conspired together and orchestrated a fraudulent scheme to entice Cliven Bundy and his supporters, including, without limitation, Plaintiffs Dave Bundy, Mel Bundy, O'Shaughnessy and Woods, into an armed confrontation in April 2014 stemming from, among other things: the rounding-up and seizure of certain Bundy Ranch cattle, and staging of same in Bunkerville, Nevada; the egregious execution of other cattle from helicopters circling the Bundy Ranch and surrounding Gold Butte area; and their unauthorized destruction of various Bundy family spring sites.

29.     The round-up operation was intentionally and deliberately carried out, upon information and belief, at the specific direction of GOVERNMENT EMPLOYEES Ahmed, Myhre, Bogden, Love, Stover and Brunk in a brutal, violent and aggressive manner.

30.     Notably, upon information and belief, BLM SAC Love and Officer Stover determined that violent, aggressive, excessive and authoritarian tactics would force Cliven Bundy and his supporters (e.g., the Tier 2 Plaintiffs, the Bundy Family members and others) to react or otherwise respond physically, and thereby "justify" the GOVERNMENT EMPLOYEES' planned "use of force" in the Cattle Impoundment Operation.

. . .

31.     To that end, a whistleblower memorandum authored by BLM Special Agent Larry Wooten in November 2017 expressly documented and memorialized BLM SAC Love's stated intention to violently kick Cliven Bundy in the mouth as other BLM agents arrested him and took him to the ground.

32.     THE GOVERNMENT EMPLOYEES' Cattle Impoundment Operation and resulting  "standoff" proved to be an absolute disaster for the UNITED STATES; notably, hundreds of protestors came out to support the Bundy family, express their anger for the federal government's abuse of power, its usurpation of State's rights and the unconstitutional taking and destruction of private property in violation of law.

33.     Although Plaintiffs Dave Bundy, Mel Bundy, O'Shaughnessy and Woods did not engage in any wrongful conduct, they, nevertheless, were:  wrongfully arrested, detained, imprisoned and in-custody for twenty-three (23) months, mostly in federally-contracted prisons, including, without limitation, a prison in Pahrump, Nevada (i.e., before being summarily released from custody based upon the UNITED STATES own pre-trial motion and judicially-determined wrongdoings, including, without limitation, prosecutorial misconduct, the UNITED STATES' knowing and intentional use of fabricated evidence to wrongfully arrest, detain and imprison the Tier 2 Plaintiffs, and its knowing and intentional failure to disclose extensive exculpatory evidence memorializing same); wrongfully separated from their families, friends and loved ones; forced to endure the UNITED STATES rogue prosecution based upon on fabricated charges for crimes they did not commit; and egregiously placed them and the Bundy Family on the "No Fly List" along with precluding PLAINTIFFS from purchasing firearms based upon the GOVERNMENT EMPLOYEES' designation of them as "domestic terrorists."

34.     Notably, Plaintiffs Dave Bundy, Mel Bundy, O'Shaughnessy and Woods were falsely indicted in the Underlying Action on sixteen (16) criminal counts, including, without limitation, conspiracy, conspiracy to impede federal officers, assaulting, threatening, extorting, and obstructing federal officers, and four (4) counts of using firearms in crimes of violence resulting from a "standoff" with agents of the BLM and other federal agencies near Bunkerville, Nevada in connection with the UNITED STATES Cattle Impoundment Operation.

35.     During that same period of time, Plaintiffs Marylynn Bundy and Briana Bundy were harassed, targeted, repeatedly followed and instigated by the GOVERNMENT EMPLOYEES and other agents / officers of the aforementioned federal agencies; and they, along with their children, were forced to endure, among other things: stress and mental, physical and emotional anguish; loss of consortium resulting from the UNITED STATES' egregious imprisonment of Plaintiffs Dave Bundy and Mel Bundy; the inability for their family to freely practice their faith and attend weekly family worship services / other church events – tenants of the LDS faith; and financial, occupational and reputational harm as a result of the GOVERNMENT EMPLOYEES' egregious branding and characterization of PLAINTIFFS as "domestic terrorists."

**GOVERNMENT EMPLOYEES' Official Capacity Conduct Performed While Acting in the Scope and Course of Their Employment**

36.     Plaintiffs fully incorporate herein by this reference all allegations contained in paragraphs 1 through 35 of this Complaint.

37.     A March 27, 2014 e-mail authored by a BLM agent (whose name was redacted in court documents from the Underlying Action) to Sal Lauro, BLM Director of the Office of Law Enforcement & Security ("OLES"), and Amy Lueders, BLM's Nevada State Director, confirmed that the U.S. Attorneys Office (led by AUSA Bogden in 2014) was "attempting to direct [the] law enforcement efforts" and was actually planning and staging the events well before the rogue criminal prosecution commenced.  Namely:

> [a]s for the rest of the operational guidance, it appears the NV USA is *directing tactical decisions*, something I've never seen in 19 years of law enforcement....[I]'m in a unique situation in which I must work with a prosecution agency that is attempt[ing] to *direct my enforcement efforts*. (Emphasis Added).

38.     GOVERNMENT EMPLOYEES Ahmed, Myhre, Bogden, Love, Brunk, Stover and Willis "knew or reasonably should have known that the action[s] [they] took within [their] sphere of official responsibility would violate the constitutional rights of the [PLAINTIFFS], or [alternatively they] took the action[s] with ... malicious intent[] to cause a deprivation of constitutional rights or other injury."

39.     Under the direction, guidance and control of AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, and others carefully prepared and fabricated evidence throughout the investigation stage of the Underlying Action, and knowingly, intentionally and willfully concealed exculpatory evidence regarding the Tier 2 Plaintiffs' innocence and the outrageous, unlawful and unconstitutional aspects of the UNITED STATES conduct related thereto.

40.     For example, GOVERNMENT EMPLOYEES Willis, Love, Brunk and Stover, along with other agents and officers of the FBI and BLM, intentionally and systematically fabricated, shaped and "clarified" evidence and testimony, altered records, withheld evidence, and gave false testimony so that the UNITED STATES could falsely accuse, obtain grand jury indictments against, detain, prosecute and convict the Tier 2 Plaintiffs of crimes they did not commit.

41.     In the days following the April 12, 2014 "standoff" and cattle release, many GOVERNMENT EMPLOYEE witnesses authored reports and gave interviews.  Notably, Officer Brunk reported that, on April 6, 2014, he witnessed Dave Bundy's false arrest from a hilltop where Officer Brunk "was acting as a spotter/observer for a BLM sniper."  Nearly a year later, on February 24, 2015, Agent Willis attempted to "correct"Officer Brunk's prior statement by having Officer Brunk "clarify" that he "never acted as a spotter/observer for a BLM sniper, nor did he ever tell the FBI [that] he acted as a spotter/observer for a BLM sniper during his original interview."

42.     Upon information and belief, Agent Willis attempted to "correct" the record and his subsequent testimony to protect himself and AUSA's Ahmed, Myhre and Bogden from prosecution for providing or otherwise suborning contrary, perjured testimony before the Grand Jury, and to assist the GOVERNMENT EMPLOYEES in furtherance of their unlawful conspiracy.  Upon information and belief, Agent Willis's clandestine attempt to "clarify" the statement of an employee of another federal agency (the BLM) was performed at the direction of AUSA's Ahmed, Myhre and Bogden.  In this regard, AUSA's Ahmed, Myhre, Bogden and Agent Willis each knew that Officer Brunk's prior witness statement was true and correct and, to

conceal that truth and shroud their own misconduct, falsified evidence and withheld exculpatory evidence to ensure that the GOVERNMENT EMPLOYEES' "version of events" matched the fabricated record that AUSA's Ahmed, Myhre, Bogden and Agent Willis had presented to the Grand Jury to secure rogue indictments against the Tier 2 Plaintiffs.  Not only did AUSA's Ahmed, Myhre, Bogden and Agent Willis falsely inform the Grand Jury that the UNITED STATES did not deploy snipers in 2014, these same GOVERNMENT EMPLOYEES later drafted the indictments to wrongly accuse the Bundy defendants, including the Tier 2 Plaintiffs, of falsely alleging that there were.

43.    In furtherance of the GOVERNMENT EMPLOYEES' fabricated scheme, BLM SAC Love cloaked the BLM Cattle Impoundment Operation as merely an effort to enforce a 2013 civil court order obtained by AUSA's Ahmed and Bogden.  In reality, however, the primary purpose behind the 2014 Cattle Impoundment Operation was to frame and entrap Cliven Bundy, the Tier 2 Plaintiffs and other supporters to react or otherwise physically respond to the GOVERNMENT EMPLOYEES' violent, aggressive, excessive and authoritarian tactics, and thereby, "justify" the GOVERNMENT EMPLOYEES' planned "use of force" and their fabrication of criminal charges against them.

44.    To that end, the GOVERNMENT EMPLOYEES staged a confrontation between the Bundys and BLM "contract cowboys" during a local television news interview on March 28, 2014.  Notably, BLM SAC Love and Officer Stover coordinated, timed and orchestrated the arrival of the BLM-hired "contract cowboys" and their corresponding equipment to coincide with a pre-arranged television interview between Cliven Bundy and his sons with KLAS Channel 8 News at that same location (an interview, upon information and belief, that was surreptitiously arranged by BLM SAC Love and Officer Stover).

45.    BLM SAC Love and Officer Stover secretly filmed the encounter between the Bundys and the BLM's "contract cowboys" with the intent of provoking violence and/or hostilities between them – conduct which, in turn, would prompt law enforcement intervention and the planned arrests of Cliven Bundy and his supporters, including, without limitation the Tier 2 Plaintiffs.  The Bundys and their supporters, however, did not respond to the BLM's

"contract cowboys" provocation and, instead, peacefully photographed the "contract cowboys" to memorialize the incident and the egregious attempt by the GOVERNMENT EMPLOYEES to entrap or otherwise provoke the Bundys into a violent response.

46.     Notwithstanding the foregoing, the UNITED STATES would later use video from this March 28, 2014 BLM "contract cowboy" incident to intentionally mislead a federal grand jury into indicting the Tier 2 Plaintiffs, essentially spinning this incident as an example of the Bundys' provocation of the BLM, including their violent response to the BLM's Cattle Impoundment Operation and its "stand-off" area near the Toquop Wash and Interstate-15 in Clark County, Nevada.

47.     Moreover, during their investigative efforts in 2013 and leading up to the March and April 2014 incidents, DOJ representatives, including, without limitation, AUSA's Ahmed, Myhre and Bogden, upon information and belief, knowingly, intentionally and willfully modified, revised and supplemented the operational plan proposed by BLM SAC Love and Officer Stover to ensure that the final Cattle Impoundment Operation would, among other things: outrage the ranching community, especially the Bundy family and their supporters; provoke a confrontation between them; and entrap the Bundy family, including, without limitation, the Tier 2 Plaintiffs, into responding with physical acts of violence that would justify the GOVERNMENT EMPLOYEES' arrest, detainment and incarceration of  Cliven Bundy, the  Tier 2 Plaintiffs and other Bundy family supporters.

48.     Pursuant to that scheme, the GOVERNMENT EMPLOYEES closed to the public nearly six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm areas, and purposefully forced all those who wanted to challenge the UNITED STATES actions to do so at one of two small dirt parcels adjacent to highways in the Bunkerville area known as "First Amendment Zones."  Notably, these two areas, located a considerable distance away from the BLM's Cattle Impoundment Operation and orchestrated "staging area," were, upon information and belief, purposefully selected by AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, among others, to maximize the impairment of any protestor's First Amendment rights, including, without limitation, the Tier 2 Plaintiffs and Bundy Family

members, and incite those who would protest against the UNITED STATES rogue operation and unconstitutional conduct (e.g., the purposeful destruction of the Bundy family's spring sites/ artesian wells and accompanying water rights) into a physical altercation.

49.     In particular, the GOVERNMENT EMPLOYEES' egregious plan, orchestrated by AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Stover and Brunk, among others:  seized cattle belonging to Cliven Bundy and the Bundy Ranch; visibly transported same to the BLM's "staging area;" demonstrably shooting several other cattle from helicopters circling the Bundy Ranch and surrounding areas; and, after having destroyed several thousands of dollars worth of the Bundy family's water right improvements and artesian springs / aquifers, purposefully parading a convoy of DOI / BLM vehicles and other construction demolition equipment before the Bundys, the Tier 2 Plaintiffs and their supporters to provoke them into resisting or otherwise defying the GOVERNMENT EMPLOYEES' efforts.

50.     In furtherance of that same scheme, the GOVERNMENT EMPLOYEES, and others at their direction and control, later brutally arrested, assaulted, beat and kicked Plaintiff Dave Bundy, as AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, among others, had planned.

51.     Throughout that entire investigative / pre-judicial process, AUSA's Ahmed, Myhre, Bogden, BLM SAC Love, Officers Stover and Brunk, among others, purposefully, intentionally and knowingly sought to infringe upon various well-known and clearly understood federal and state constitutional rights for the calculated and orchestrated purpose to entrap the Bundys, the Tier 2 Plaintiffs and their supporters, and instigate them into physically or violently responding to the GOVERNMENT EMPLOYEES' egregious actions and interference with those rights.

52.     Although the GOVERNMENT EMPLOYEES collectively knew that their concocted charges were false, they, nevertheless, deceptively attempted to strong-arm the Tier 2 Plaintiffs into accepting a plea (knowing that any such agreement could be used against all of the the other named Bundy defendants in the Underlying Action).  In this regard, the GOVERNMENT EMPLOYEES, at the direction of AUSA's Ahmed, Myhre and Bogden,

advised the Tier 2 Plaintiffs, among other things, that:  a conviction against them on all counts would impose mandatory minimum life sentences which would separate them from their friends, family and loved ones for many years – an outcome that could be avoided if they simply pled guilty to one or more of the bogus conspiracy charges; and, if they did so, the UNITED STATES would release them from custody for time served.

53.     The GOVERNMENT EMPLOYEES, at the direction of AUSA's Ahmed, Myhre and Bogden, directed that informants be planted among the Tier 2 Plaintiffs during their incarceration and that other inmates housed with the Tier 2 Plaintiffs surreptitiously be offered the immediate release from custody if those inmates would testify falsely against the Tier 2 Plaintiffs regarding the UNITED STATES concocted criminal charges.

54.     The GOVERNMENT EMPLOYEES, at the direction of AUSA's Ahmed, Myhre and Bogden, also prepared, instructed, and directed others to prepare fabricated investigative documents for those inmates to sign, thus manufacturing false evidence that would be used in their rogue prosecution against the Tier 2 Plaintiffs in violation of law and said Plaintiffs' constitutional and due process rights.

**The State of Nevada's Intervention & De-Escalation Efforts**

55.     Recognizing that the unlawful and unconstitutional powder-keg lit by the UNITED STATES was rapidly escalating out of control, Nevada's former Governor (Brian Sandoval), former Clark County Sheriff (Doug Gillespie) and Assistant Clark County Sheriff (Joe Lombardo) intervened to de-escalate the matter.

56.     Notably, in the midst of increasing political pressure and public outrage over the GOVERNMENT EMPLOYEES' egregious conduct, the former Nevada Governor, Clark County Sheriff and Assistant Sheriff took control of the scene and, through Assistant Clark County Sheriff Joe Lombardo issued orders directing the BLM and GOVERNMENT EMPLOYEES to wind-down their operation and to release the Bundy family's cows from the cattle pen.

57.     AUSA Bodgen and BLM SAC Love, recognizing that the GOVERNMENT EMPLOYEES' unlawful and unconstitutional conduct had failed to produce the planned result, implemented those orders and directed federal and state officers to ensure that "a Bundy," if not

14

1  Cliven Bundy himself, would pull the pins from the cattle pens so that the DOJ could use that
2  affirmative act to establish the UNITED STATES fabricated theories of criminal conspiracy,
3  extortion, armed robbery, among other false claims, against the Bundy defendants and Tier 2
4  Plaintiffs.

5       58.     In accordance with the State orders and at the direction of the GOVERNMENT
6  EMPLOYEES, Margaret Houston, a sister of Cliven Bundy, ultimately "pulled the pin" on the
7  cattle pen and released the cattle.  AUSA's Ahmed, Myhre and Bogden, in turn, used that
8  physical act to support the UNITED STATES rogue prosecution of the Bundy defendants,
9  including, without limitation, the Tier 2 Plaintiffs.

10  **Defendant's Longbow Productions Scam**

11      59.     In furtherance of the GOVERNMENT EMPLOYEES' scheme to wrongfully
12  prosecute the Bundy defendants, including the Tier 2 Plaintiffs, and to manufacture evidence in
13  support of the fabricated claims against them, AUSA's Ahmed, Myhre, Bogden and Agent Willis
14  concocted a scheme to deceive the Bundys, the Tier 2 Plaintiffs and their supporters, into making
15  incriminating statements or confessions through the UNITED STATES unprecedented
16  undercover FBI operation named "Longbow Productions."

17      60.     Notably, AUSA's Ahmed, Myhre and Bogden, and Agent Willis, among others,
18  directed hundreds of thousands of taxpayer dollars into an operation in which masqueraded FBI
19  undercover agents falsely posed as a film crew making a documentary of the 2014 "standoff."

20      61.     Upon information and belief, AUSA's Ahmed, Myhre and Bogden, and Agent
21  Willis directed the FBI undercover agents to entice the Tier 2 Plaintiffs, along with the other to-
22  be-named Bundy defendants, with alcohol, money and other goods and favors to exaggerate
23  their respective involvement in the UNITED STATES orchestrated "standoff" or to otherwise
24  misstate, exaggerate or falsely hype the event itself, so that the UNITED STATES
25  could increase the likelihood of securing convictions in rogue criminal proceedings that the
26  GOVERNMENT EMPLOYEES would ultimately initiate.

27      62.     To that end, AUSA's Ahmed, Myhre and Bogden, and Agent Willis, among
28  others, successfully deceived various Bundy family members and supporters into participating in

1   the "staged" interviews – interviews in which the undercover FBI agents, at said

2   GOVERNMENT EMPLOYEES' prodding, asked leading questions, with the answers being

3   selectively edited and later used by the GOVERNMENT EMPLOYEES in the Underlying

4   Action.

5   **Subornation of Perjury & Falsehoods to the Grand Jury**

6        63.    The fact that AUSA Bogden had scripted and directed the filming of a video

7   depicting "a Bundy" removing a pin from the cattle pen at the UNITED STATES Cattle

8   Impoundment Operation became problematic for AUSA's Ahmed, Myhre and Bogden when they

9   sought to obtain a grand jury indictment against the Bundy defendants, including the Tier 2

10  Plaintiffs, the following year.

11       64.    Since AUSA Bogden stepped out of his role as prosecutor and assumed the role of

12  investigator (one who directed, supervised and led law enforcement personnel in the filming of

13  that incident), he was a material witness thereto - one who was never cross-examined or

14  otherwise testified regarding that unprotected, unprivileged conduct.

15       65.    Notably, during the October 14, 2015 Grand Jury proceedings, AUSA Myhre

16  purposefully avoided a Grand Juror's question directed at the UNITED STATES involvement in

17  the pin removal act and purposefully proffered evasive testimony to avert BLM SAC Love from

18  disclosing the truth regarding that incident.  In particular:

19             **MYHRE**:    But you never received any order to release the cattle?

20             **LOVE**:    No sir, did not.

21             An unknown grand juror asked Love to clarify his statements indicating that Dave
           Bundy and Ryan Bundy *"did release the cattle" "but on your [Love's] authority, is*

22             *that correct?"*  Love responded *"No I did not give them the authority to release*
           *the cattle."*  The Grand juror followed up: *"No but I'm just saying it's on your*

23             *authority you had them release the cattle . . . ."*

24             At that point Myhre underlined(interrupted the proceedings), stopped Love from answering
           and began to testify himself by asking leading questions.

25
26             **MYHRE**:    "But your decision wasn't to release the cattle, your decision was
                         to abandon the ICP, Incident Command Post, is that correct?

27             **LOVE:**    That is correct and then to turn over – obviously by abandoning
                         the cattle are left there in the pen and I was thereby leaving the

28                           cattle and then admonishing and explaining to the Bundys that

should they so choose to release those cattle they would be doing so under potential violation of federal law with recourse."

**MYHRE**:  "So in essence you were not giving them permission to release the cattle? You are saying we're leaving and that if you release the cattle it's in violation of federal law."

66.     Throughout 2015 and 2016, AUSA's Ahmed, Myhre and Bogden, Agent Willis, BLM SAC Love, Officers Stover and Brunk deliberately, maliciously and intentionally mislead the Grand Jury so that they could falsely obtain indictments against the Tier 2 Plaintiffs.

67.     For example, on June 29, 2015, AUSA Myhre and Agent Willis knowingly, intentionally and willfully misled the Grand Jury regarding the circumstances surrounding Plaintiff Dave Bundy's April 6, 2014 false arrest.

68.     Specifically, AUSA Myhre egregiously stated that Plaintiff Dave Bundy was doing "some sort of reconnaissance or trying to take photographs of the BLM as they were coming off the range ..." with Agent Willis testifying that Dave Bundy was in a "closed area" and that the "agents encountered them in a closed area and asked them to leave."

69.     AUSA Myhre and Agent Willis, however, knew that they were intentionally deceiving and misleading the Grand Jury when they provided that false information and testimony.   In particular, said GOVERNMENT EMPLOYEES knew that, on that day, Dave Bundy, his brother Ryan Bundy, and other Bundy family members were traveling from Utah to the Bundy Ranch in Clark County, Nevada to bring birthday flowers to their mother via Nevada State Route 170 (S.R. 170) – which was <u>not</u> a "closed area" – when Dave Bundy observed what appeared to be snipers on the hill above.

70.     Dave Bundy lawfully parked his car on the side of S.R. 170 and began photographing and filming the hilltop snipers with his Apple iPad.  BLM agents, in response, falsely arrested him (and did so without any arrest authority or probable cause); illegally towed and searched his car; unlawfully removed and confiscated his iPad without a warrant (an electronic device that contained photographs and video of the hilltop snipers, along with a recording of his telephone conversation to a 9-1-1 operator as the BLM agents were unlawfully arresting him).  Pursuant to a District Court Order, Dave Bundy's Apple iPad was eventually returned to him in 2017, albeit in an erased, altered and damaged state.

71.     On March 2, 2016, AUSA's Ahmed, Myhre and Bogden knowingly and intentionally suborned perjurious testimony from Agent Willis to secure an indictment against Dave Bundy, falsely claiming that Dave Bundy's vehicle was intended to impede the GOVERNMENT EMPLOYEES' convoy as it emerged onto on S.R. 170.  Specifically:

> **AHMED**:     And the BLM believed because of the positions of the vehicles, including Dave Bundy's, that they could easily impede that convoy as it emerged onto State Route 170, isn't that right?

> **WILLIS**:     Yes.

72.     Notably, AUSA's Ahmed, Myhre and Bogden and Agent Willis knew that Plaintiff Dave Bundy's vehicle was lawfully parked more than fifty (50) feet away from the S.R. 170 intersection and, as such, could not conceivably have been perceived as an attempt to impede the GOVERNMENT EMPLOYEES' convoy.  Further, AUSA's Ahmed, Myhre and Bogden and Agent Willis also unequivocally knew, but intentionally and willfully withheld from the Grand Jury, that there never was any probable cause or justification to arrest Dave Bundy.

73.     At that same time, AUSA Ahmed knowingly, intentionally and willfully elicited false testimony from Agent Willis regarding Plaintiff Mel Bundy, baldly testifying that, on April 12, 2014, Plaintiff Mel Bundy threatened federal officers when, in fact, AUSA Ahmed and Agent Willis knew that there was absolutely no evidence of any such threats, nor probable cause to substantiate Mel Bundy's arrest.

74.     On September 16, 2015, AUSA Ahmed knowingly, intentionally and willfully elicited false and misleading testimony from Officer Stover before the Grand Jury regarding the BLM's threat assessments of the Bundy's and Tier 2 Plaintiffs and their propensity for engaging in potential acts of violence.  AUSA Ahmed and Officer Stover, well-aware that the BLM assessments actually established that the Bundys would not engage in potential acts of violence, elicited and provided false testimony claiming that the Bundy's would, in fact, respond with potential acts of violence.

75.     At that same time, AUSA Ahmed and Officer Stover also knowingly, intentionally and willfully elicited and provided false and misleading testimony regarding the

UNITED STATES use of snipers.  Despite the fact that numerous federal agents / snipers were located on hillsides around the Bundy Ranch and Cattle Impoundment Operation's "staging area" in April 2014 pursuant to the GOVERNMENT EMPLOYEES' scheme, AUSA Ahmed and Officer Stover egregiously claimed that the operational plan did not include the use of snipers, and the purported use of snipers was merely a story concocted by the Bundy's and their supporters.

76.      AUSA Ahmed and Officer Stover also materially misled the Grand Jury regarding the UNITED STATES First Amendment Zones imposed on the Bundy family, the Tier 2 Plaintiffs and their supporters in March and April 2014.

77.      As noted above, the GOVERNMENT EMPLOYEES closed to the public nearly six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm areas and, in so doing, imposed the single largest infringement on free speech in American history (measured geographically).

78.      Hundreds of Americans traveled to the Bunkerville, Nevada area to protest the UNITED STATES impairment of the Bundy family's First Amendment right to free speech and the expression of their religious freedoms – restrictions which were also denounced by numerous public officials who readily acknowledged the unconstitutionality of same.

79.      Consequently, AUSA Ahmed and Officer Stover knew that in order for the Grand Jury to indict the demonstrators (persons who merely came to protest the GOVERNMENT EMPLOYEES' egregious conduct, support the Bundy family and exercise their own constitutionally-protected free speech rights), they had to knowingly, intentionally and willfully mislead Grand Jury regarding same.

80.      To that end, on September 16, 2015, AUSA Ahmed and Officer Stover knowingly, intentionally and willfully misled the Grand Jury into believing the following:

**AHMED:**   Did the operation plan consider having designated areas in the operation area for people who wanted to view the governments activities or the impound operation itself?"

**STOVER:**   "It did."

**AHMED:**   "And were those areas actually what would come to be known as the First Amendment zones or First Amendment areas?"

**STOVER:** "Correct. . . . It included those areas <u>not to dictate</u> to people where they could express their First Amendment rights but it allowed an area that was safe for the public to go to and get them in <u>as close proximity as possible</u> to the closed operational area so they would have chance to <u>if they wanted to view some of the gather operations</u>?"

**AHMED:** "Is this setting up of areas <u>as close as possible</u> to where the operation activities are taking place, is that something that the BLM includes regularly in its gathering operations?"

**STOVER:** "Sure. . . ."

81.     Notably, however, AUSA Ahmed and Officer Stover knew that the First Amendment Zones:  (1)  <u>were mandatory</u> (i.e., federal officers told protesters that they must go to the designated First Amendment Zones); (2) offered <u>no view whatsoever of any Cattle Impoundment Operations</u>; (3) were located <u>miles away from those operations</u>; and (4) were actually patrolled, monitored and watched over by armed government agents.

82.     Tellingly, during the first trial of the Tier 3 matter, Officer Stover admitted on cross examination that the UNITED STATES First Amendment Zones "were not areas that were appropriate" for citizens to exercise their First Amendment rights.

**Defendant's Rogue Indictment**

83.     On March 2, 2016, after several months of presenting fabricated, misleading and perjured evidence and testimony to the Grand Jury, AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, and Agent Willis obtained an indictment against the Tier 2 Plaintiffs – evidence which these GOVERNMENT EMPLOYEES knew was false and directly contradicted by exculpatory evidence which said representatives knowingly, intentionally and willfully withheld from the Grand Jury, the Bundy defendants, including the Tier 2 Plaintiffs and their counsel.

84.     That same day, AUSA's Ahmed, Myhre and Bogden, and Agent Willis egregiously sought the issuance of arrest warrants for Dave Bundy, Mel Bundy, O'Shaughnessy and Woods, knowing that there was absolutely no probable cause whatsoever to support any of their arrests.

85.     To that end, AUSA's Ahmed, Myhre and Bogden, and Agent Willis withheld exculpatory evidence from the judicial officer that issued the warrants, and knowingly used false, fabricated and manufactured evidence to secure same.

86.     On March 3, 2016, the Tier 2 Plaintiffs were unlawfully arrested and taken into custody.

87.     Shortly thereafter, the GOVERNMENT EMPLOYEES filed their indictment against them and, although the indictment measured sixty (60) pages in length and accused 19 men of 16 separate criminal counts, the indictment was silent as to any basis or probable cause to detain, arrest or otherwise prosecute the Tier 2 Plaintiffs for any of those crimes.

88.     Notably, the Tier 2 Plaintiffs actual conduct (i.e., lawfully protesting the UNITED STATES egregious actions, standing, walking, riding horses and taking pictures of Defendants' unlawful conduct) was deceptively described by the GOVERNMENT EMPLOYEES in their rogue indictment as threatening, assaulting and extorting federal officers, obstructing justice, and conspiring to violate federal laws or impede federal officers.

89.     Further, after the indictment was filed in the Underlying Action, AUSA's Ahmed, Myhre and Bogden, Agent Willis, BLM SAC Love, and Officers Stover and Brunk conspired with one another to conceal, among other evidence, Dave Bundy's iPad, the BLM threat assessments, the GOVERNMENT EMPLOYEES' use of snipers and other exculpatory evidence from the Tier 2 Plaintiffs, their counsel, and all of the Bundy defendants in the Underlying Action.

90.     The indictment also falsely claimed that the Bundy defendants in the Tier 1 proceeding "caused images of DAVE BUNDY's arrest to be broadcasted ... combining them with false, intentionally misleading and deceptive statements 'to the effect' [that the] BLM supposedly employed snipers ... used excessive force ... and arrested Bundy for exercising his First Amendment rights."

91.     During an evidentiary hearing of the Tier 1 trial, it was irrefutably established that the BLM did, in fact, employ snipers and use excessive force.

. . .

21

92.     Those same facts, in conjunction with the UNITED STATES intentional withholding of exculpatory evidence (*Brady* disclosures and materials) and prosecutorial misconduct prompted Chief Judge Navarro to dismiss the United States case against the Tier 1 defendants.

93.     The indictment also baldly asserted that the Tier 2 Plaintiffs had used firearms in several serious crimes of violence.  At no time, however, did Plaintiffs Dave Bundy, Mel Bundy or O'Shaughnessy ever display, use, or threaten to use firearms, nor did they commit any crimes, let alone a crime of violence.  While it is true that Plaintiff Woods was lawfully in possession of a firearm at certain times on April 12, 2014, his possession thereof was in full accordance with his Second Amendment right to bear arms and, at all times, was maintained in a safe, proper and lawful manner – at no time did he display, use, or threaten to use his firearm, nor commit any crime, let alone a crime of violence.

**False Allegations Against O'Shaughnessy**

94.     The rogue indictment against Plaintiff O'Shaughnessy simply alleged that he "was a resident of Arizona who traveled to Nevada with the intent to commit the crimes set forth" therein, and accused him of being a "mid-level leader and organizer of the conspiracy who, among other things: organized gunmen and other Followers; led gunmen and other Followers in the assault and extortion of federal law enforcement officers at the Impound Site; organized protection for members of the criminal enterprise; and organized armed patrols and security checkpoints."

95.     At no time, however, did the UNITED STATES possess probable cause to arrest, detain or otherwise prosecute Plaintiff O'Shaughnessy.

96.     Moreover, the GOVERNMENT EMPLOYEES and the UNITED STATES knew that each and every material accusation set forth in the Indictment against Plaintiff O'Shaughnessy was inaccurate, false and intentionally misleading.

**False Allegations Against Woods**

97.     The rogue indictment against Plaintiff Woods simply alleged that he "was a resident of Arizona who traveled to Nevada with the intent to commit the crimes set forth"

1   therein, and accused him of being a "gunman who threatened, impeded, intimidated, interfered

2   with, assaulted and extorted federal law enforcement officers while in the performance of their

3   duties, as described [therein]."

4        98.    At no time, however, did the UNITED STATES possess probable cause to arrest,

5   detain or otherwise prosecute Plaintiff Woods.

6        99.    Moreover, the GOVERNMENT EMPLOYEES and the UNITED STATES

7   knew that each and every material accusation set forth in the Indictment against Plaintiff Woods

8   was inaccurate, false and intentionally misleading.

9        **False Allegations Against Dave Bundy & Mel Bundy**

10       100.    The rogue indictment against Plaintiffs Dave Bundy and Mel Bundy, based solely

11  upon their status as sons of Cliven Bundy, baldly accused them of being "leaders and organizers

12  of the conspiracy who, among other things: recruited gunmen and other Followers; interfered

13  with impoundment operations through threats and use of force and violence; interfered with

14  impoundment operations by attempting to extort BLM contractors; led the armed

15  assault against federal law enforcement officers at the Impoundment Site; delivered extortionate

16  demands to law enforcement officers; and extorted federal law enforcement officers."

17       101.    The indictment also materially misrepresented Dave Bundy's actions that

18  ultimately led to his false arrest on April 6, 2014, egregiously claiming that he "interfered with

19  impoundment operations by positioning [himself] to block a BLM convoy and refusing to leave

20  the area when asked to do so" and after "[f]ailing to leave after repeated requests ... [he] was

21  arrested by law enforcement officers."

22       102.    Notably, as images from the April 6, 2014 incident confirmed (images of which

23  AUSA's Ahmed, Myhre and Bogden and Agent Willis were well-aware at that time), Plaintiff

24  Dave Bundy's vehicle was parked at least fifty (50) feet away from the claimed S.R. 170

25  intersection where the BLM convoy would ultimately travel and, at that location, it was

26  impossible for Dave Bundy's vehicle to have "blocked" the BLM convoy.

27       103.    Further, as AUSA's Ahmed, Myhre and Bogden and Agent Willis were also well

28  aware, Dave Bundy was lawfully exercising his First Amendment rights when he photographed

1  and filmed on his iPad the BLM officers, spotters and snipers in plain view from the public

2  highway, and that he was under no legal obligation "to leave the area when asked to do so."

3      104.    The GOVERNMENT EMPLOYEES also knew that Dave Bundy's iPad captured

4  photographs and video of those entire events (evidence which completely exonerated Dave

5  Bundy, established the egregiousness of the GOVERNMENT EMPLOYEES' actions that day,

6  undermined the fabricated testimony of AUSA Ahmed and Agent Willis to the Grand Jury, and

7  exposed other multiple false and misleading statements contained in the indictment),

8  including, without limitation, Dave Bundy's telephone call with a 911 operator while he was

9  being falsely arrested and assaulted by the BLM officers.

10     105.    Upon information and belief, AUSA's Ahmed, Myhre and Bogden, BLM SAC

11 Love, Officers Stover and Brunk, and Agent Willis, among others, hid, concealed, converted,

12 altered, damaged and/or erased this exculpatory evidence from Dave Bundy's iPad and

13 concealed same from the Tier 2 Plaintiffs as part of the GOVERNMENT EMPLOYEES'

14 egregious scheme to wrongfully convict the Tier 2 Plaintiffs and imprison them for life for

15 crimes they did not commit.

16     106.    The GOVERNMENT EMPLOYEES also failed to disclose that Dave Bundy

17 was released from custody the following day without prosecution.

18     107.    With regard to Plaintiff Mel Bundy, the UNITED STATES rogue indictment

19 baldly alleged that his presence in a vehicle while a reporter (Pete Santilli) questioned BLM

20 SAC Love as to what the BLM "would do if 10,000 people show[ed] up" to the "stand-off"

21 constituted a "threat" by the reporter and one that the UNITED STATES unconscionably

22 imputed to Mel Bundy.

23     108.    The GOVERNMENT EMPLOYEES also falsely alleged that on April 9, 2014,

24 Mel Bundy, along with others, "assaulted, interfered with, impeded and intimidated federal

25 officers by, among other things, intercepting and blocking a convoy of BLM vehicles engaged in

26 impoundment operations ...."

27 . . .

28 . . .

109.   Notably, however, at that time, the GOVERNMENT EMPLOYEES knew that Mel Bundy was being interviewed by news reporters at a location well over a mile away and, as such, was not, nor could he have been, present as the GOVERNMENT EMPLOYEES alleged.

110.   Further, the GOVERNMENT EMPLOYEES also knew that photographic and video evidence memorializing the claimed incident further unequivocally confirmed that Mel Bundy was not there at that time.

**The GOVERNMENT EMPLOYEES Wrongful Concealment of Threat Assessments & Other Misrepresentations to Federal & Magistrate Judges**

111.   In furtherance of GOVERNMENT EMPLOYEES' conspiracy to keep the Tier 2 Plaintiffs falsely imprisoned (i.e., so that their release from custody could be used as a potential bargaining chip in securing a negotiated plea arrangement from one of the Tier 1 defendants, most notably, Cliven Bundy), AUSA's Ahmed, Myhre and Bogden argued to the Court that the Tier 2 Plaintiffs were the most dangerous, violent criminals in the history of Nevada.

112.   AUSA's Ahmed, Myhre and Bogden made these egregious statements knowing, among other things, that: (a) according to their own internal (i.e., DOJ / U.S. Attorney's Office) threat assessments, none of the Tier 2 Plaintiffs were dangerous or violent, nor did they otherwise pose any risk of being same; (b) their false statements would enable the UNITED STATES to wrongfully detain the Tier 2 Plaintiffs, preclude them from being released on bail, and deny them a speedy trial; and (c) their falsehoods would deprive the Tier 2 Plaintiffs of various federal and state constitutional rights.

113.   AUSA's Ahmed, Myhre and Bogden also materially misled the Court regarding evidence which undermined the UNITED STATES false portrayal of the Tier 2 Plaintiffs and the lengths to which the Tier 2 Plaintiffs would purportedly go in defiance of the actions taken by the UNITED STATES.

114.   For example, during detention hearings in 2016, AUSA Ahmed knowingly, intentionally and willfully advised a U.S. Magistrate Judge that, on April 12, 2014, Tier 2 Plaintiff Mel Bundy brought his own children into the Toquop Wash (the location of the "stand-off") and directed those children, in a strategic and tactical manner, to further the "massive

1   assault on federal officers" that was falsely described in the underlying indictment.  AUSA

2   Ahmed knew that her statements were false when made and that, during the "standoff," Mel

3   Bundy's children were located many miles away in another state.

4        115.   AUSA's Ahmed, Myhre and Bogden, in furtherance of the GOVERNMENT

5   EMPLOYEES' conspiracy, also knowingly, intentionally and willfully misled the Court on

6   multiple occasions, regarding the FBI's involvement in this matter – egregiously representing

7   that the FBI was not involved, and that their claimed involvement by the Bundy defendants,

8   including the Tier 2 Plaintiffs, was complete "fiction" on their part and true "urban folklore."

9        116.   In reality, however, AUSA's Ahmed, Myhre and Bogden knew that the FBI was

10   actively involved and, among other things:  had engaged in an extensive surveillance and

11   reconnaissance effort which included, without limitation, the Bundy defendants and Tier 2

12   Plaintiffs, their respective properties and the aforementioned First Amendment zones;

13   conducted around-the-clock monitoring of those areas from an FBI Command Center which,

14   upon information and belief, enabled real-time viewing of same by agency department officials

15   located in Washington, D.C.; and had extensive exculpatory photographic and video-

16   surveillance documentation – none of which was ever produced, disclosed or otherwise

17   identified by the UNITED STATES and, in fact, was knowingly, intentionally and willfully

18   concealed by the GOVERNMENT EMPLOYEES in furtherance of their conspiracy – the

19   existence of which was revealed for the first time during trial proceedings involving the Tier 3

20   group.

21   **The Unraveling of the GOVERNMENT EMPLOYEES' Conspiracy**

22        117.   In early February 2017, during the first trial of the Tier 3 defendants,[3] a BLM

23   Case Agent assigned to assist BLM SAC Love and a material witness for the UNITED STATES

24   (i.e., BLM Special Agent Larry Wooten) noticed that the defense lawyers were not cross-

25   examining government witnesses with expected questions arising from exculpatory evidence

26   . . .

27   _____

28       [3]     The Tier 3 group consisted of Eric Parker, Scott Drexler, Greg Burleson, Steve
Stewart, Todd Engel and Rick Lovelein.

1  which Mr. Wooten had provided to the UNITED STATES and AUSA's Ahmed, Myhre and

2  Bogden.

3      118.    On February 16, 2017, Mr. Wooten confronted AUSA's Ahmed, Myhre and

4  Bogden regarding this issue, whether the UNITED STATES had properly disclosed the

5  exculpatory evidence and other suspected *Brady* violations.

6      119.    Fearing that BLM Special Agent Wooten would reveal the nature and extent of

7  the GOVERNMENT EMPLOYEES' conspiracy and its unlawful/unconstitutional conduct,

8  AUSA Myhre retaliated by abruptly removing Mr. Wooten from the prosecution team and any

9  further involvement in the case.

10      120.    To that end, on February 18, 2017, AUSA Myhre directed that Mr. Wooten's

11  office be raided and ordered that all of Mr. Wooten's papers and electronic files related to the

12  Underlying Action be seized.

13      121.    Upon information and belief, when Mr. Wooten learned of the unauthorized

14  search of his office and the seizure of all of his case files from the Underlying Action, he

15  complained of same to his superiors and, at that time, was threatened and warned by Myhre-

16  directed BLM officers to keep his mouth shut about the prosecutorial misconduct in the case.

17      122.    After conferring with a DOI/BLM Ethics Official, the U.S. Office of Special

18  Counsel ("OSC"), the BLM Office of Law Enforcement & Security Director (Salvatore Lauro)

19  and the DOJ Office of Professional Responsibility ("OPR") – each of whom ignored

20  Mr. Wooten's concerns and sought to distance themselves from same – Mr. Wooten submitted a

21  whistleblower complaint to the DOJ Associate Deputy Attorney General and National Criminal

22  Discovery Coordinator (Andrew D. Goldsmith) to expose the GOVERNMENT EMPLOYEES'

23  egregious conduct, including, without limitation, the non-disclosure of exculpatory evidence and

24  other *Brady* violations.

25      123.    Specifically, in a document entitled "Disclosure and Complaint Narrative in

26  Regard to Bureau of Land Management Law Enforcement Supervisory Misconduct and

27  Associated Cover-ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by

28  United States Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in

Reference to the Cliven Bundy Investigation," (hereinafter "Whistleblower Complaint"),
Mr. Wooten exposed the GOVERNMENT EMPLOYEES' conspiracy and their unlawful,
unconstitutional conduct.

124.    Notably, Mr. Wooten revealed, among other things, that:

A.    There was a "widespread pattern of bad judgment, lack of discipline,
incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal
violations among senior and supervisory staff at the BLM's Office of Law Enforcement and
Security."

B.    The "issues amongst law enforcement supervisors in our agency made a
mockery of our position of special trust and confidence, portrayed extreme unprofessional bias,
adversely affected our agency's mission and likely the trial regarding Cliven Bundy and his
alleged co-conspirators and ignored the letter and intent of the law."

C.    "The issues [he] uncovered ... also likely put [the DOI / BLM] and
specific law enforcement supervisors in potential legal, civil, and administrative jeopardy."

D.    This was "the largest and most expansive and important investigation
ever within the Department of Interior."

E.    BLM SAC Love "specifically took on assignments that were potentially
questionable and damaging (such as document shredding, research, discovery email search
documentation and as the affiant for the Dave Bundy iPad Search Warrant) ... [Mr. Wooten felt
like BLM SAC Love] wanted to steer the investigation away from misconduct discovery ..."

F.    "The misconduct caused considerable disruption in our workplace, was
discriminatory, harassing and showed clear prejudice against the defendants, their supporters
and Mormons."

G.    "Oftentimes this misconduct centered on being sexually inappropriate,
profanity, appearance/body shaming and likely violated privacy and civil rights."

H.    There were "potentially captured comments in which [DOI / BLM] law
enforcement officers allegedly bragged about roughing up Dave Bundy, grinding his face into

the ground, and Dave Bundy having little bits of gravel stuck to his face" as a result of his unlawful arrest.

I.      "On two occasions, [Mr. Wooten] overheard [BLM SAC Love] tell [another DOI / BLM assistant special agent in charge] that another/other BLM employee(s) and potential trial witnesses didn't properly turn in the required discovery material (likely exculpatory evidence)."

J.      BLM SAC Love "even instigated the unprofessional monitoring of jail calls between defendants and their wives, without prosecutor or FBI consent, for the apparent purpose of making fun of post arrest telephone calls ...."

K.      BLM SAC Love sought "to command the most intrusive, oppressive, large scale, and militaristic trespass cattle impound possible.  Additionally, this investigation also indicated excessive use of force, civil rights and policy violations."

L.      BLM SAC Love was not regularly updating the U.S. Attorney's Office "on substantive and exculpatory case findings and unacceptable bias indications" and, as such, [Mr. Wooten] personally informed ... Acting United States Attorney Steven Myhre and Assistant United States Attorney (AUSA) Nadia Ahmed, as well as Federal Bureau of Investigation (FBI) Special Agent Joel Willis by telephone of these issues."

M.      For example, Mr. Wooten advised AUSA Myhre that when Plaintiff Dave Bundy was arrested "on April 6, 2014, the BLM ... the BLM SAC and others were told not to make any arrests" (i.e., they had no arrest authority) and that BLM SAC Love made exculpatory statements that would need to be disclosed to the defense team including, without limitation, "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" and BLM SAC Love's directive to DOI / BLM officers "to get the troops fired up to go get those cows and not take any crap from anyone" – statements which AUSA Myhre acknowledged would need to be disclosed but never were.

N.      On February 18, 2017, when Mr. Wooten "was removed from [his] position, ... [BLM SAC Love] conducted a search of [Mr. Wooten's] individually occupied secured office and secured safe within that office.  During that search, ... [BLM SAC Love]

without notification or permission seized the Cliven Bundy/Gold Butte Nevada Investigative 'hard copy' Case File, notes (to include specific notes on issues [Mr. Wooten] uncovered during the 2014 Gold Butte Nevada Trespass Cattle Impound and 'lessons learned') and several computer hard drives that contained case material, collected emails, text messages, instant messages, and other information."

     O.    "Following this seizure outside of [Mr. Wooten's] presence and without [his] permission, [BLM SAC Love] didn't provide any property receipt documentation (DI-105/Form 9260-43) or other chain of custody documentation (reasonably needed for trial) on what was seized."

     P.    Mr. Wooten "was also aggressively questioned [by BLM SAC Love] about who [Mr. Wooten] had told about the case related issues and other severe issues uncovered in reference to the case and [BLM SAC Love]."

     Q.    Mr. Wooten also notes that he was "convinced that [he] was removed to prevent the ethical and proper further disclosure of severe misconduct, failure to correct and report, and cover-ups ...." including, without limitation, "civil rights violations and excessive use of force."

     R.    To that end, Mr. Wooten identified "the loss/destruction of, or purposeful non-recording of key evidentiary items (Unknown Items 1 & 2, Video/Audio, April 6, 2014, April 9, 2014, April 12, 2014 - the most important and critical times in the operation)."[4] Tellingly, Mr. Wooten concluded that he "believe[d] these issues would shock the conscious of the public and greatly embarrass [the BLM] if they were disclosed."

    125.    By October 2017, trial of the Tier 1 Bundy defendants[5] was nearing commencement and defense lawyers in that action expressed concerns to the Court regarding

---

    [4]    In a subsequent e-mail from Mr. Wooten to (now former) DOJ Office of the Inspector General Attorney Mark Masling (who was tasked with investigating this matter *after* the Underlying Action was dismissed), Mr. Wooten noted that there was a "dumpster of shredded BLM documents."

    [5]    The Tier 1 group consisted of Cliven Bundy, his sons Ryan Bundy and Ammon Bundy, and Ryan Payne.

1  missing documents and other evidence that had not been produced or otherwise disclosed by the

2  UNITED STATES and AUSA's Ahmed, Myhre and Bogden, but was known to exist.

3      126.    In response, Chief District Court Judge Navarro held an evidentiary hearing and,

4  at that hearing, numerous *Brady* violations were discovered, including, without limitation,

5  extensive exculpatory evidence regarding the Tier 2 Plaintiffs that had been knowingly,

6  intentionally and willfully withheld by the UNITED STATES and AUSA's Ahmed, Myhre and

7  Bogden.

8      127.    In this regard, as the January 8, 2018 Hearing Transcript ("Transcript") from the

9  Tier 1 Motion to Dismiss Hearing unequivocally reveals, Chief Judge Navarro expressly held,

10  among other things, that:

11          A.    "A district court may dismiss an Indictment on the ground of outrageous

12  government conduct if the conduct amounts to [a] due process violation." Transcript at 8:18-21

13  (*quoting United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1991)).

14          B.    "To violate due process, governmental conduct must be ... 'so grossly

15  shocking and so outrageous as to violate the universal sense of justice.'" Transcript at 9:01-05

16  (*quoting United States v. Restrepo*, 930 F.2d 705 (1991); *United States v. Ramirez*, 710 F.2d

17  535 (9t h Cir. 1983)).

18          C.    "Outrageous government conduct occurs when the actions of law

19  enforcement officers or informants are so outrageous that due process principles would

20  absolutely bar the government from invoking judicial processes to obtain a conviction."

21  Transcript at 9:09-16 (*quoting United States v. Archie*, 2016 WL 475234 (D.Nev. 2016), *cert

22  denied*, 2019 WL 5152784 (9th Cir. 2019); *United States v. Black*, 733 F.3d 294 (9th Cir. 2013);

23  *United States v. Russell*, 411 U.S. 423 (1973)).

24          D.    "[D]ismissal under this 'extremely high' standard is appropriate only in

25  'extreme cases in which the government's conduct violates fundamental fairness.'"Transcript at

26  9:17-21 (*quoting U.S. v Pedrin*, 797 F.3d 792 (9th Cir. 2015); *United States v. Smith*, 924 F.2d

27  889 (9th Cir. 1991)).

28

E.     "So, when reviewing a claim alleging that the Indictment should be dismissed because the government's conduct was outrageous, evidence is viewed in the light most favorable to the government." Transcript at 9:22 to 10:01 (*citing United States v. Gurolla*, 333 F.3d 944 (9th Cir. 2003)).

F.     "The concept of outrageous government conduct focuses on the government's actions." Transcript at 10:02–3 *(citing United States v. Restrepo*, 930 F.2d 705 (1991)).

G.     "Here in this case, both the prosecution and the investigative agencies are equally responsible for the failure to produce *Brady* materials to the defense." Transcript at 10:04-06.

H.     The Court finds the prosecution's representations that it was unaware of the materiality of the Brady evidence is grossly shocking." Transcript at 10:13-15.

I.     "[T]he government was well aware that theories of self-defense, provocation and intimidation might become relevant if the defense could provide a sufficient offer of proof to the Court.  However, the prosecution denied the defense its opportunity to provide favorable evidence to support their theories as a result of the government's withholding of evidence and this amounts to a *Brady* violation." Transcript at 10:22 to 11:11.

J.     "[T]he prosecutor has a duty to learn of favorable evidence known to other government agents, including the police, if those persons were involved in the investigation or prosecution of the case." Transcript at 11:07–11 (*citing Kyles v. Whitley*, 514 U.S. 419 (1995).

K.     "Clearly, the FBI was involved in the prosecution of this case." Transcript at 11:12.

L.     "Based on the prosecution's failure to look for evidence outside of that provided by the FBI and the FBI's failure to provide evidence that is potentially exculpatory to the prosecution for discovery purposes, the Court finds that a universal sense of justice has been violated." Transcript at 11:13–17.

1          M.      Alternatively, a district court may exercise its supervisory powers in three

2 different enumerated ways:  Number one, 'to remedy unconstitutional or statutory violation[s]';

3 number two, 'to protect judicial integrity by ensuring that a conviction rests on appropriate

4 considerations validly before a jury'; or number three, 'to deter future illegal conduct."

5 Transcript at 11:24 to 12:06 (quoting *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1991)).

6          N.      "In *United States vs. W.R. Grace*," 504 F.3d 745 (9th Cir. 2007) "the

7 Ninth Circuit clarified that the exercise of the Court's inherent powers is not limited to these

8 three grounds enumerated in *Simpson* ...." Transcript at 11:24 to 12:07-10.

9          O.      "'Dismissal is appropriate when the investigatory or prosecutorial process

10 has violated a federal Constitution or statutory right and no lesser remedial action is available.'"

11 Transcript at 12:11-14 (*quoting U.S. v. Barrera-Moreno*, 951 F.2d 1089 (9th Cir. 1991)).

12          P.      "The Ninth Circuit has recognized that exercise of a supervisory power is

13 an appropriate means of policing ethical misconduct by prosecutors." Transcript at 11:15-18

14 (*citing U.S. v. Lopez*, 4 F.3d 1455 (9th Cir. 1993)).

15          Q.      "So 'dismissal under the Court's supervisory powers for prosecutorial

16 misconduct requires both: 'Number one, flagrant misbehavior, and number two, substantial

17 prejudice.'" Transcript at 12:19-23 (*quoting United States v. Kearns*, 5 F.3d 1251 (9th Cir.

18 1993)).

19          R.      "Neither accidental nor mere negligent governmental conduct is

20 sufficient.  The idea of prejudice entails that the government's conduct had at least some impact

21 on the verdict and thus rounded to the defendant's prejudice." Transcript at 12:24 to 13:02.

22          S.      "In Order for the Court to dismiss an Indictment under the supervisory

23 powers, the Court must find that there has been flagrant prosecutorial misconduct, substantial

24 prejudice to the defendants, and that no lesser remedial action is available." Transcript at 13:03-

25 06.

26          T.      "So the Court looks to *Chapman*, *U.S. v. Chapman*." [524 F.3d 1073 (9th

27 Cir. 2008)] ... The district court in *Chapman* found that the 'Assistant U.S. Attorney acted

28 flagrantly, willfully and in bad faith' and that he had made 'affirmative misrepresentations to the

Court,' and that the defendants would be prejudiced by a new trial and that no lesser standard would adequately remedy the harm done after reviewing the totality of the proceedings before it." Transcript at 14:8, 14:12-18.

U. "The Ninth Circuit held that the *Chapman* court did not abuse its discretion by dismissing the Indictment pursuant to its supervisory powers." Transcript at 14:10-21.

V. "'The prosecutor has a 'sworn duty' to assure that the defendant has a fair and impartial trial. His interest in a particular case is not necessarily to win, but to do justice.'" Transcript at 15:14-17 (*quoting U.S. v. Chapman*." 524 F.3d 1073 (9th Cir. 2008)).

W. "[T]he fact that the prosecution failed to look beyond the files provided by the FBI is not mere negligence; it is a reckless disregard for its Constitution[al] obligations to learn and seek out favorable evidence. The prosecution's reliance on the FBI to provide the required information *amounted to an intentional abdication of its responsibility*." Transcript at 16:11-16 (Emphasis Added).

X. "Thus, the Court does find that there has been flagrant prosecutorial misconduct in this case ...." Transcript at 19:09-10.[6]

Y. "The Court is troubled by the prosecution's failure to look beyond the FBI file that was provided and construes the Brady violations in concert as a reckless disregard of its discovery obligations. The government's recklessness and the prejudice the defendants will suffer as a result of a retrial warrant the extreme measure of dismissing the Indictment because no lesser sanction would adequately ... deter future investigatory and prosecutorial misconduct." Transcript at 20:14-21.

Z. "[The government's] conduct has caused the integrity of a future trial and any resulting conviction to be even more questionable. Both the defense and the community

---

[6] With regard to the prejudice resulting from the government's recent production of BLM Officer Wooten's Whistleblower Complaint, Judge Navarro was troubled by his "abrupt removal ... in February 2017, allegedly by the prosecution because he complained of Special Agent in Charge Dan Love's misconduct, the investigating law enforcement officer's bias, the government's bias, and the failure to disclose exculpatory evidence." Transcript at 19:23 to 20:05.

1  possess the right to expect a fair process with a reliable conclusion.  Therefore, it is the Court's

2  position that none of the alternative sanctions available are as certain to impress the government

3  with the Court's resoluteness in holding prosecutors and their investigative agencies to the

4  ethical standards which regulate the legal profession as a whole." Transcript at 20:23 to 21:07.

5       AA.     "***The Court finds that the government's conduct in this case was indeed***

6  ***outrageous, amounting to a due process violation***, and that a new trial is not an adequate

7  sanction for this due process violation." Transcript at 21:08-11 (Emphasis Added).

8       BB.     "Even if the government's conduct did not rise to the level of a due

9  process violation, the Court would nonetheless dismiss under its supervisory powers because

10 there has been flagrant misconduct, substantial prejudice, and no lesser remedy is sufficient ...

11 Number one, to properly remedy the constitutional violation; number two, to protect judicial

12 integrity by ensuring that a conviction rests only on appropriate considerations validly before a

13 jury; and number three, to deter future illegal conduct." Transcript at 21:12-16, 21:20-24.

14      128.    On the heels of the GOVERNMENT EMPLOYEES' conspiracy being exposed

15 and the lead case of the consolidated matter being dismissed, the UNITED STATES, on

16 February 7, 2019 voluntarily moved to dismiss, with prejudice, their fabricated criminal charges

17 against the Tier 2 Plaintiffs – false charges which directly, proximately and foreseeably caused,

18 among other things: (a) the false arrest of each Tier 2 Plaintiff; (b) the wrongful denial of bail;

19 (c) the unlawful detainment, imprisonment and monitoring of each Tier 2 Plaintiff for twenty-

20 three (23) months; (d) the egregious separation of the Tier 2 Plaintiffs from their friends, family

21 and loved ones, including, without the Bundy Family Plaintiffs, and the ongoing stress and

22 mental, physical and emotional anguish which PLAINTIFFS continue to experience; (e) the

23 corresponding loss of consortium wrongfully forced on PLAINTIFFS (f) the inability for

24 PLAINTIFFS to freely practice their faith and attend weekly family worship services / other

25 church events – tenants of the LDS faith; (g) financial, occupational and reputational harm as a

26 result of the GOVERNMENT EMPLOYEES' egregious branding and characterization of

27 PLAINTIFFS in the media as "domestic terrorists;" (h) the loss of gainful employment,

28 including, without limitation, future impairment for PLAINTIFFS' chosen professions;

(i) harassment and embarrassment resulting from the GOVERNMENT EMPLOYEES' placement and continued maintenance of PLAINTIFFS on the "No Fly List" which results in improper detainment, interrogation, delays and other travel restrictions when they attempt to fly commercially; and (j) interference with PLAINTIFFS' right to lawfully acquire and bear arms due to the GOVERNMENT EMPLOYEES' placement of PLAINTIFFS on secret lists which disqualifies and precludes them from purchasing firearms.

**The UNITED STATES' Constitutional & Statutory Violations**

129.    PLAINTIFFS fully incorporate herein by this reference all allegations contained in paragraphs 1 through 128 of this Complaint.

130.    As a direct, proximate and foreseeable cause of the GOVERNMENT EMPLOYEES' conspiracy (one that involved multiple egregious acts performed by these duly authorized representatives in their official capacity; that is, within the scope and course of their employment of their respective federal agencies, and performed in furtherance of that conspiracy), along with other independent, unprivileged acts performed by AUSA's Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, and Agent Willis, PLAINTIFFS' rights were knowingly, intentionally and willfully violated, infringed and impaired, including, without limitation:

A.    The Tier 2 Plaintiffs' right to assemble together, exercise free speech and lawfully protest against the UNITED STATES egregious conduct and its wrongful curtailment of their rights by the GOVERNMENT EMPLOYEES in contravention of the First Amendment to the United States Constitution; Article 1, Sections 1 (Inalienable Rights), 9 (Liberty of Speech) and 10 (Right to Assemble & Petition) of the Nevada Constitution; and Nevada Revised Statute ("NRS") 41.637's protection of good faith communications in furtherance of PLAINTIFFS' right to petition or the right to free speech in direct connection with an issue of public concern, including any "[c]ommunication made in direct connection with an issue of public interest in a place open to the public or in a public forum."

B.    PLAINTIFFS' right to lawfully purchase, keep and bear arms as provided for in the Second Amendment to the United States Constitution; Article 1, Section 11 (Right to

Keep & Bear Arms; Civil Power Supreme) of the Nevada Constitution; and NRS 244.364 which vests control over the regulation of, and policies concerning, firearms, firearm accessories and ammunition with the Nevada State Legislature, including, without limitation, the regulation of transfers, sales and purchases of same;

C.  The GOVERNMENT EMPLOYEES' fabricated indictments, unlawful arrests, rogue detainments, preclusion of bail, false imprisonment and malicious prosecution of the Tier 2 Plaintiffs (i.e., without probable cause or due process of law) deprived the Tier 2 Plaintiffs of their life, liberty and property rights, and constituted cruel and unusual punishment in contravention of the Fourth, Fifth and Eighth Amendments to the United States Constitution; Article 1, Section 1 (Inalienable Rights), Section 6 (Excessive Bail & Fines), Section 8 (Rights of Accused in Criminal Prosecutions) and Section 18 (Unreasonable Seizure & Search; Issuance of Warrants) of the Nevada Constitution; NRS 199.310 (Malicious Prosecution) and NRS 200.460 (False Imprisonment).

D.  The GOVERNMENT EMPLOYEES' abhorrent and outrageous conduct – conduct which irrefutably shocks the conscious – egregiously deprived the Tier 2 Plaintiffs of their life, liberty and property rights in contravention of substantive and procedural due process rights; rights guaranteed to them by the Fifth Amendment of the United States Constitution and Article 1, Section 8 of the Nevada Constitution.

E.  The GOVERNMENT EMPLOYEES' egregious placement and maintenance of PLAINTIFFS on the "Prohibited Persons List" for purchasing or otherwise acquiring a weapon governed by the Gun Control Act, 18 U.S.C. 922(g) based upon fabricated evidence and the GOVERNMENT EMPLOYEES' egregious branding and characterization of them as "domestic terrorists" without notice or an opportunity to be heard also violates PLAINTIFFS' substantive and procedural due process rights in violation of the Second Amendment to the United States Constitution and Article 1, Section 11 (Right to Keep & Bear Arms) of the Nevada Constitution.  Notably, the Prohibited Persons List only applies to persons:

- Convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

- who is a fugitive from justice;

- who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act, codified at 21 U.S.C. § 892);

- who has been adjudicated as a mental defective or has been committed to any mental institution;

- who is an illegal alien;

- who has been discharged from the Armed Forces under dishonorable conditions;

- who has renounced his or her United States citizenship;

- who is subject to a court order restraining the person from harassing, stalking, or threatening an intimate partner or child of the intimate partner; or

- who has been convicted of a misdemeanor crime of domestic violence.

None of the aforementioned prohibitions, however, apply to PLAINTIFFS and, as such, the GOVERNMENT EMPLOYEES' placement and continued maintenance of PLAINTIFFS on this Prohibited Persons List is, and remains, unconstitutional.

G.     The UNITED STATES unlawful arrest, detainment and incarceration of the Tier 2 Plaintiffs also precluded them from freely practicing their faith and attending weekly family worship services / other church events – tenants of the LDS faith – in violation of the First and Eighth Amendments to the United States Constitution, and Article 1, Section 4 (Liberty of Conscience) and Section 6 (Cruel & Unusual Punishment) of the Nevada Constitution.  Notably, throughout their incarceration, prison guards, at the direction of the GOVERNMENT EMPLOYEES, interfered with and ridiculed the Tier 2 Plaintiffs' LDS garments (undergarments worn under their clothes as a sacred symbol of their personal commitment to God and their commitment to fidelity).

**Exhaustion of Administrative Remedies**

131.     PLAINTIFFS fully incorporate herein by this reference all allegations contained in paragraphs 1 through 130 of this Complaint.

132.     Pursuant to 28 U.S.C. § 1346(b), PLAINTIFFS timely and properly submitted Claims for Damage, Injury or Death to the UNITED STATES and its requisite agencies (i.e., the FBI, DOI / BLM and the DOJ) on or about February 3, 2020, including, without limitation, an administrative tort claim demand package to the U.S. Department of Justice, Civil Division,

Torts Branch, Federal Tort Claims Act section ("FTCA Section") which the U.S. Department of Justice acknowledged had all been received by February 6, 2020.

133.    Since the FTCA Section did not act within six (6) months (i.e., <u>by August 5, 2019</u>), its failure to issue a decision is treated as a final decision, enabling Plaintiffs here to proceed with their claims against the UNITED STATES as of that date. *See* 28 U.S.C. § 2675(a).

134.    Plaintiffs, therefore, have fully satisfied and exhausted their administrative obligations to present their FTCA claims to the Court and, as such, their FTCA Claims are properly before the Court.  Further, this Court possesses exclusive subject matter jurisdiction over same, and they are ripe for adjudication.

**FIRST CLAIM FOR RELIEF**
**(Federal Tort Claims Act Claims - 28 U.S.C. § 2671 *et seq.*)**

135.    PLAINTIFFS fully incorporate herein by reference all allegations contained in paragraphs 1 through 134 of this Complaint.

136.    Pursuant to 28 U.S.C. § 1346(b), "federal district courts have jurisdiction over a certain category of claims for which the [UNITED STATES] has waived its sovereign immunity and 'render[ed]' itself liable," including, without limitation, "'claims that are:  [1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994) (*quoting* 28 U.S.C. § 1346(b)).

137.    "A claim comes within this jurisdictional grant – and thus is 'cognizable' under § 1346(b) – if it is actionable under § 1346(b).  And a claim is actionable under § 1346(b) if it alleges the six elements outlined above." *Id.* (*citing Loeffler v. Frank*, 486 U.S. 549 (1988)

138.    The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.,* is the exclusive remedy for tort actions against a Federal agency (28 U.S.C. § 2679(a)) and against

1   Federal employees who commit torts while acting within the scope and course of their

2   employment (28 U.S.C. § 2679(b)(1)).

3       139.    As set forth above, the GOVERNMENT EMPLOYEES engaged in certain

4   tortious acts in their official capacities.

5       140.    With regard to the GOVERNMENT EMPLOYEES' tortious conduct that was

6   performed while they were "acting within the scope of [their official] office[s] or employment at

7   the time of the incident out of which the [PLAINTIFFS'] claim[s] arose," the UNITED

8   STATES is solely liable for that conduct as mandated by 28 U.S.C. § 2679(d)(2)) and the

9   Federal Employees Liability Reform & Tort Compensation Act of 1988 ("Westfall Act").

10      141.    Similarly, PLAINTIFFS' exclusive remedy for their tort-based claims against the

11  GOVERNMENT EMPLOYEES' employers (i.e., the DOJ, DOI, BLM and FBI) is the UNITED

12  STATES (28 U.S.C. § 2679(a)).

13      142.    To that end, 28 U.S.C. § 2680(h) expressly provides that the UNITED STATES

14  is also liable for certain intentional torts that are based on the "acts or omissions" of an

15  "investigative or law enforcement officer" and include "[a]ny claim arising out of ... false

16  imprisonment, false arrest, [and] malicious prosecution ...." *Millbrook v. U.S.*, 569 U.S. 50, 52

17  (2013) (*citing* 28 U.S.C. § 2680(h); *see also Levin v. United States*, 568 U.S. 503 (2013)).

18      143.    Here, PLAINTIFFS have valid State-law tort claims arising out of, related to and

19  connected with the GOVERNMENT EMPLOYEES' tortious conduct that was performed in

20  their official capacity and during the scope and course of their employment with the DOJ, DOI /

21  BLM and FBI, including, without limitation, the following claims:

22              A.    <u>False Arrest</u>

23                  In Nevada, to establish false arrest, 'a plaintiff must show the defendant

24  instigated or effected an unlawful arrest." *Jones v. Las Vegas Metropolitan Police Dept.*, 2011

25  WL 13305450 at *3 (D.Nev. 2011) (*quoting Nau v. Sellman*, 757 P.2d 358, 260 (Nev. 1988)).

26  To that end, PLAINTIFFS affirmatively allege that the GOVERNMENT EMPLOYEES

27  fabricated evidence, suborned and provided perjurious testimony, and egregiously withheld and

28  destroyed exculpatory evidence so that they could erroneously secure Grand Jury Indictments

1  upon which the false arrest warrants were issued against the Tier 2 Plaintiffs.  PLAINTIFFS

2  further allege that, as a direct, proximate and foreseeable cause of the GOVERNMENT

3  EMPLOYEES' tortious acts related to the instigation or effectuation of the unlawful arrest of

4  the Tier 2 Plaintiffs (i.e., those acts performed in their official capacity, scope and employment

5  with the DOJ, DOI/BLM and FBI), the UNITED STATES is, and remains, liable therefor.

6          B.    <u>False Imprisonment</u>

7          In Nevada, "[f]alse imprisonment is an unlawful violation of the personal

8  liberty of another, and consists in confinement or detention without legal sufficient authority."

9  NRS 200.460.  "To establish false imprisonment of which false arrest is an integral part, it is ...

10  necessary to prove that the person be restrained of his liberty under probable imminence of force

11  without any legal cause or justification." *Jones*, 2011 WL 13305450 at *3 (*quoting Hernandez*

12  *v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981).  "Thus, 'an actor is subject to liability to

13  another for false imprisonment 'if (a) he acts intending to confine the other ... within the

14  boundaries fixed by the actor, and (b) his act directly or indirectly results in a confinement of the

15  other, and (c) the other is conscious of the confinement or is harmed by it.'" *Id.* (*quoting*

16  Restatement (Second) of Torts § 35 (1965)).  PLAINTIFFS, here, affirmatively allege that the

17  Tier 2 Plaintiffs were unlawfully detained, imprisoned and held in-custody by the UNITED

18  STATES for twenty-three (23) months, mostly at a sweltering federal-contractor prison in

19  Pahrump, Nevada.  PLAINTIFFS further allege that, as a direct, proximate and foreseeable

20  cause of those tortious acts related to the Tier 2 Plaintiffs' incarceration (i.e., acts performed by

21  the GOVERNMENT EMPLOYEES in their official capacity, scope and employment with the

22  DOJ, DOI/BLM and FBI), those acts:  (a) were performed with the intention of confining the

23  Tier 2 Plaintiffs to prison; (b) they directly or indirectly resulted in the Tier 2 Plaintiffs'

24  confinement; and (c) all PLAINTIFFS were conscious of that unlawful confinement.  As a

25  result, the UNITED STATES is, and remains, liable therefor.

26          C.    <u>Malicious Prosecution</u>

27          In Nevada, "[a] person who maliciously and without probable cause

28  therefor, causes or attempts to cause another person to be arrested or proceeded against for any

crime of which that person is innocent" is liable for malicious prosecution. NRS 199.310.  In

this regard, to state a claim for malicious prosecution under Nevada law, a Plaintiff must allege:

"(1) that the defendant lacked probable cause to initiate a prosecution; (2) malice; (3) the prior

criminal proceedings were terminated in his favor; and (4) Plaintiff suffered damages."

*Anderson v. United States*, 2019 WL 6357256 at *2 (D.Nev. 2019) *(quoting LaMantia v. Redisi*,

118 Nev. 27, 30, 38 P.3d 877, 879 (Nev. 2002)).  PLAINTIFFS here affirmatively allege that,

the GOVERNMENT EMPLOYEES' fabrication of evidence, elicitation and providing of

perjurious testimony, along with the egregious withholding and destruction of exculpatory

evidence so that they could wrongfully secure Grand Jury Indictments and arrest warrants

against the Tier 2 Plaintiffs establishes the absence of probable cause, along with the malicious

intent of said GOVERNMENT EMPLOYEES' conduct.  PLAINTIFFS further allege that the

UNITED STATES' dismissal, with prejudice, of all charges against the Tier 2 Plaintiffs

unequivocally establishes that the Underlying Action was terminated in the Tier 2 Plaintiffs'

favor.  Moreover, as detailed below, PLAINTIFFS sustained damages as a direct, proximate and

foreseeable cause of the aforementioned tortious conduct.

### D.  Intentional Infliction of Emotional Distress

In *Sheehan v. U.S.*, 896 F.2d 1168, 1172 (9th Cir. 1990), the Ninth

Circuit Court of Appeals expressly recognized the appropriateness of an intentional infliction of

emotional distress claim in FTCA actions.  To that end, in Nevada, "[t]he elements of a cause of

action for intentional infliction of emotional distress are '(1) extreme and outrageous conduct

with either the intention of, or reckless disregard for, causing emotional distress, (2) the

plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate

causation.'" *Dillard Dept. Stores, Inc. v. Beckwith*, 115 Nev. 372, 378, 989 P.2d 882, 886 (Nev.

1999).  PLAINTIFFS here affirmatively allege that the GOVERNMENT EMPLOYEES'

conduct (i.e., for those acts performed in their official capacity, scope and employment with the

DOJ, DOI/BLM and FBI) was: (1) extreme and outrageous and accomplished with the intent, or

reckless disregard for, causing PLAINTIFFS' emotional distress; (2) the PLAINTIFFS, in fact,

have suffered, and continue to suffer from, severe and extreme emotional distress; which

(3) was actually or proximately caused. As a result, the UNITED STATES is, and remains, liable for PLAINTIFFS' damages (discussed below).

        E.     <u>Loss of Consortium</u>

"Nevada law recognizes that '[a]n action for loss of consortium is derivative of the primary harm to the physically injured spouse (parent)).'" *Fakoya v. County of Clark*, 2014 WL 5020592 at \*9 (D.Nev. 2014) (*citing Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark*, 122 Nev. 466, 134 P.3d 111 (Nev. 2006). Here, PLAINTIFFS affirmatively allege that as a direct, proximate and foreseeable cause of the GOVERNMENT EMPLOYEES' tortious conduct, including, without limitation, the physical injuries sustained by Tier 2 Plaintiffs Dave Bundy and Mel Bundy, the Bundy Family Plaintiffs have validly stated claims for relief against the UNITED STATES for those acts, performed by the GOVERNMENT EMPLOYEES in their official capacity, within the scope and course of their employment. Notably, PLAINTIFFS affirmatively allege that, as a direct, proximate and foreseeable cause the aforementioned injuries:

        1.     Plaintiff Marylynn Bundy, the wife of Tier 2 Plaintiff Dave Bundy, lost the love, affection, protection, support, services, companionship, care, society and sexual relations of her husband, all of which warrant an award of damages.

        2.     Plaintiffs Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma Bundy and Piper Bodel Bundy also lost the love, affection, protection, support, care, society and parental guidance of their father, Dave Bundy, all of which warrant an award of damages.

        3.     Plaintiff Briana Bundy, the wife of Tier 2 Plaintiff Mel Bundy, lost the love, affection, protection, support, services, companionship, care, society and sexual relations of her husband, all of which warrant an award of damages.

        4.     Plaintiffs Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy also lost the love, affection, protection, support, care, society and parental guidance of their father, Mel Bundy, all of which warrant an award of damages.

144.     PLAINTIFFS further allege that as a direct, proximate and foreseeable cause of certain GOVERNMENT EMPLOYEES' official capacity conduct performed in the scope and course of their employment with the DOJ, DOI / BLM and FBI, Plaintiffs Marylynn Bundy and Briana Bundy suffered severe emotional, physical, mental, occupational and financial distress – damages and injuries which continue to this day.

145.     Pursuant to 28 U.S.C. § 1346(b), PLAINTIFFS timely and properly submitted a Claim for Damage, Injury or Death to the UNITED STATES and its requisite agencies; more than six (6) months have elapsed since the DOJ acknowledged its receipt of that demand package, rendering said claims denied pursuant to 28 U.S.C. § 2675(a); and, as such, PLAINTIFFS have fully satisfied and exhausted their administrative obligations to present their FTCA claims to the Court.

**WHEREFORE**, PLAINTIFFS are entitled to judgment against the UNITED STATES for the following relief:

A.     Monetary damages in an amount to be proven at trial;

B.     Attorneys' fees and costs;

C.     Pre-judgment and post-judgment interest pursuant to law;

D.     For hedonic damages in favor of the Tier 2 Plaintiffs for the impairment to their future employment opportunities;

E.     Compensatory damages arising out of, related to or connected with the reputational harm of being branded "domestic terrorists;"

F.     All such other and further relief as the Court may deem just and equitable, including, without limitation, post-judgment attorneys' fees and costs.

RESPECTFULLY SUBMITTED this 30th day of June, 2022.



Marquiz Law Office
Professional Corporation
♦

By: /s/ Craig A. Marquiz, Esq.
Craig A. Marquiz, Esq.
3088 Via Flaminia Court
Henderson, NV 89052
Counsel for Plaintiffs