1
2
3
4
5                  UNITED STATES DISTRICT COURT

6                       DISTRICT OF NEVADA

7

8   JOSEPH O'SHAUGHNESSY,                Case No.:  2:22-cv-01039-WQH-EJY
    individually; MEL BUNDY,
9   individually; JASON D. WOODS,        **ORDER**
    individually; DAVE BUNDY,
10  individually; MARYLYNN
    BUNDY, individually; BRIANA
11  BUNDY, individually; BRETT
    ROY BUNDY, individually;
12  MAYSA LYNN BUNDY,
    individually; DALLY ANN
13  BUNDY, individually; BRONCO
    CLIVEN BUNDY, individually;
14  PAYTON ALMA BUNDY,
    individually; PIPER BODEL
15  BUNDY, individually;
    MONTANA BUNDY,
16  individually; BENTILE BUNDY,
    individually; PRESLY BUNDY,
17  individually; KYMBER BUNDY,
    individually; and ADAHLEN
18  BUNDY, individually,

19                            Plaintiffs,

20  v.

21  UNITED STATES OF
    AMERICA; DOES 1 through 100;
22  and ROES 1 through 100,
    inclusive,
23
                              Defendants.
24

25

26

27

28

HAYES, Judge:

The matter before the Court is the Motion to Dismiss filed by Defendant United States of America ("Defendant"). (ECF No. 26.)

## I.   PROCEDURAL BACKGROUND

On June 30, 2022, Plaintiffs initiated this action by filing a Complaint pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* (ECF No. 1.)

On November 21, 2022, Defendant filed the Motion to Dismiss. (ECF No. 26.) On March 27, 2023, Plaintiffs filed a Response in opposition to the Motion to Dismiss.[1] (ECF No. 35.) On July 12, 2023, Defendant filed a Reply. (ECF No. 46.)

On October 25, 2023, the Court conducted oral argument on the Motion to Dismiss. (ECF No. 49.)

## II.   ALLEGATIONS IN THE COMPLAINT

### A. Background

Plaintiffs Joseph O'Shaughnessy, Mel Bundy, Jason Woods, and Dave Bundy (collectively the "Tier 2 Plaintiffs") were defendants in a criminal action brought by Defendant United States in the District of Nevada titled *United States v. Bundy et al.*, Case No. 2:16-cr-00046-GMN-PAL (the "Underlying Action"). "In the Underlying Action, [the defendants] were separated into three (3) distinct trial groups; namely, the 'Tier 1' (the alleged 'leadership' defendants); 'Tier 2' (the claimed 'mid-level leadership' defendants);

---

[1] Plaintiffs also filed a Motion to File Plaintiffs' Consolidated Opposition to Defendant's Motion to Dismiss (O'Shaughnessy, Dkt. 26; Engel, Dkt. 19) that Exceeds Page Limits Pursuant to LR7-3(c) ("Motion to File Excess Pages"). (ECF No. 37.) The Court grants Plaintiffs' Motion to File Excess Pages. To the extent that Plaintiffs intend for the legal arguments contained within their counsel's forty-seven-page Declaration to be considered a supplemental brief in Response to the Motion to Dismiss, such legal arguments should have been contained within the brief itself rather than in a Declaration from counsel. *See, e.g.*, *King County v. Rasmussen*, 299 F.3d 1077, 1082 (9th Cir. 2002) ("Declarations, which are supposed to set forth facts as would be admissible in evidence, should not be used to make an end-run around the page limitations of [Local] Rule 7 by including legal arguments outside of the briefs."); *Laurent v. JP Morgan Chase, N.A.*, No. 2:14-cv-00080-APG-VCF, 2016 WL 1270992, at *4 n.1 (D. Nev. Mar. 31, 2016) ("Because these statements [in an affidavit] constitute legal arguments and conclusions, rather than declarations of fact, I will not consider them."). As such, the Court does not consider any legal arguments raised in any Declaration attached to Plaintiffs' Response.

and 'Tier 3' (the alleged 'gunmen') groups." (ECF No. 1 ¶ 7 n.1.) Tier 2 Plaintiffs were members of the Tier 2 trial group. Plaintiffs Marylynn Bundy, Briana Bundy, Brett Roy Bundy, Maysa Lynn Bundy, Dally Ann Bundy, Bronco Cliven Bundy, Payton Alma Bundy, Piper Bodel Bundy, Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy, and Adahlen Bundy (collectively the "Bundy Family Plaintiffs") are spouses and children of Plaintiffs Mel Bundy and Dave Bundy.

The Bundy family owns land in the "Gold Butte area" in Clark County, Nevada, upon which it "formed the Bundy Ranch." *Id.* ¶¶ 20–21. "Over the generations, the Bundy family … improve[d] the Bundy Ranch" by "developing numerous artesian springs/aquifers" and "securing title … to the accompanying water rights." *Id.* ¶ 24. The Bundy family has used those springs to provide water for its cattle, which "were lawfully grazing on the Bundy Ranch and its surrounding lands." *Id.* ¶ 25.

"[A]s part of an egregious plan to eliminate ranching operations within the region, divest or otherwise acquire the private water rights held by those ranchers…, and to sell-off or otherwise lease those rights for commercial development or other land-use purposes," the United States Department of Interior and Bureau of Land Management ("BLM") began "imposing restrictive grazing permits and fees, and limiting the number of cattle that could graze upon those lands." *Id.* ¶ 26. "To that end," Defendant, through the United States Department of Justice ("DOJ") and Assistant United States Attorneys ("AUSAs") Nadia Ahmed and Daniel Bogden, obtained a $1 million judgment against non-party Cliven Bundy in a 1998 civil lawsuit "for [Cliven Bundy's] refusal to obtain BLM grazing permits and pay the corresponding fees." *Id.* ¶ 27.

**B. 2014 Cattle Impoundment Operation and Standoff**

After obtaining the judgment, AUSAs Ahmed, Bogden, and Steven Myhre; Federal Bureau of Investigation ("FBI") Special Agent Joel Willis; BLM Special Agent in Charge ("SAC") Daniel Love; and BLM Officers Rand Stover and Mark Brunk (collectively, the "Government Employees") "conspired together and orchestrated a fraudulent" April 2014

cattle impoundment operation (the "Operation" or "Cattle Impoundment Operation").[2] *Id.* ¶ 28. The Operation was "cloaked" as "merely an effort to enforce a 2013 civil court order obtained by AUSA[s] Ahmed and Bogden." *Id.* ¶ 43. "In reality, however, the primary purpose behind the operation was to frame and entrap Cliven Bundy" and other supporters, including Tier 2 Plaintiffs, by enticing them "into an armed confrontation" so as to "'justify' the [Government Employees'] planned 'use of force' and their fabrication of criminal charges against them." *Id.* ¶¶ 28, 43.

Leading up to April 2014, "DOJ representatives, including… [AUSAs] Ahmed, Myhre and Bogden … modified, revised and supplemented [an] operational plan proposed by [ ] SAC Love and Officer Stover to ensure that the final Cattle Impoundment Operation would … outrage the ranching community" and "provoke a confrontation." *Id.* ¶ 47. The participation of the United States Attorney's Office for the District of Nevada in planning and staging the Operation is demonstrated by a March 27, 2014, e-mail authored by an unknown BLM agent to his superiors that stated: "[I]t appears the NV USA is directing tactical decisions, something I've never seen in 19 years of law enforcement.... [I]'m in a unique situation in which I must work with a prosecution agency that is attempt[ing] to direct my enforcement efforts." *Id.* ¶ 37 (emphasis omitted).

On March 28, 2014, "SAC Love and Officer Stover coordinated, timed and orchestrated the arrival of the BLM-hired 'contract cowboys' and their corresponding equipment to coincide with a pre-arranged television interview between Cliven Bundy and his sons … at that same location." *Id.* ¶ 44. Love and Stover "secretly filmed the encounter … with the intent of provoking violence…—conduct which, in turn, would prompt law enforcement intervention and the planned arrests of Cliven Bundy and his supporters." *Id.* ¶ 45. However, the Bundys and their supporters did not respond and instead "peacefully photographed the 'contract cowboys' to memorialize the incident." *Id.*

---

[2] The Complaint alleges that at all relevant times the Government Employees were acting in their official capacity and within the scope of their employment. (*See* ECF No. 1 ¶ 17.)

In the ensuing Cattle Impoundment Operation, the Government Employees and others "seized cattle belonging to Cliven Bundy and the Bundy Ranch"; transported the seized cattle to a "staging area"; shot other cattle "from helicopters"; "destroyed several thousands of dollars worth of the Bundy family's water right improvements and artesian springs / aquifers"; and "purposefully parad[ed] a convoy of DOI / BLM vehicles and other construction demolition equipment before the Bundys, [ ] Tier 2 Plaintiffs and their supporters to provoke them into resisting or otherwise defying the [Government Employees'] efforts." *Id.* ¶ 49. The Operation was "intentionally and deliberately carried out … at the specific direction of [the Government Employees] in a brutal, violent and aggressive manner" because "BLM SAC Love and [BLM] Officer Stover determined that violent, aggressive, excessive and authoritarian tactics would force Cliven Bundy and his supporters … to react or otherwise respond physically." *Id.* ¶¶ 29–30. "[A] whistleblower memorandum authored by BLM Special Agent Larry Wooten in November 2017 expressly documented and memorialized [ ] Love's stated intention to violently kick Cliven Bundy in the mouth as other BLM agents arrested him and took him to the ground." *Id.* ¶ 31.

During the Cattle Impoundment Operation, the Government Employees closed "nearly six hundred thousand (600,000) acres of land" to the public. *Id.* ¶ 48. This forced the "[h]undreds of Americans [that] traveled to the … area to protest" Defendant's actions to protest at one of two small "First Amendment Zones" "located a considerable distance away from the [ ] Cattle Impoundment Operation." *Id.* ¶¶ 48, 78. These zones were "purposefully selected" by AUSAs Ahmed, Myhre and Bogden, BLM SAC Love, Officers Stover and Brunk, and others, "to maximize the impairment of any protestor's First Amendment rights." *Id.* ¶ 48.

On April 6, 2014, Plaintiff Dave Bundy and others were traveling from Utah to the Bundy Ranch "via Nevada State Route 170," an area open to the public, when Bundy "observed what appeared to be snipers on the hill above." *Id.* ¶ 69. Bundy "lawfully parked his car" and "began photographing and filming" the snipers. *Id.* ¶ 70. In response, BLM agents arrested him "without any … authority or probable cause," illegally towed and

searched his car, and confiscated his iPad. *Id.* The Government Employees and others further "brutally … assaulted, beat and kicked Plaintiff Dave Bundy." *Id.* ¶ 50.

On April 12, 2014, a "standoff" between government agents and the Bundy family and its supporters occurred. *Id.* ¶ 41. "In the days following" the standoff, "Officer Brunk reported that, on April 6, 2014, he witnessed Dave Bundy's false arrest from a hilltop where Officer Brunk 'was acting as a spotter/observer for a BLM sniper.'" *Id.*

AUSAs Ahmed, Myhre, and Bogden, and Special Agent Willis also directed an undercover FBI operation named "Longbow Productions," in which "masqueraded FBI undercover agents falsely posed as a film crew making a documentary" and "entice[d]" Tier 2 Plaintiffs and others "with alcohol, money, and other goods and favors to exaggerate their" involvement in the standoff to increase the likelihood of securing convictions in the Underlying Action. *Id.* ¶¶ 59–61. The undercover operation "successfully deceived" various individuals into participating in "staged" interviews, which were "selectively edited and later used" in the Underlying Action. *Id.* ¶ 62.

"Recognizing that the unlawful and unconstitutional powder-keg lit by [Defendant] was rapidly escalating out of control," Nevada state officials "intervened to de-escalate the matter" by directing "the BLM and Government Employees to wind-down their operation and to release the Bundy family's cows." *Id.* ¶¶ 55, 56. In implementing these orders, AUSA Bogden and SAC Love "directed federal and state officers to ensure that 'a Bundy'… would pull the pins from the cattle pens so that the DOJ could use that affirmative act to establish [ ] fabricated [charges]" against the defendants in the Underlying Action. *Id.* ¶ 57. "In accordance with the State orders and at the direction of the [Government Employees], Margaret Houston, a sister of Cliven Bundy, ultimately 'pulled the pin' on the cattle pen and released the cattle." *Id.* ¶ 58.

**C. Grand Jury Proceedings and Indictment**

In 2015, AUSAs Ahmed, Myhre, and Bogden "sought to obtain a grand jury indictment against the Bundy defendants, including [ ] Tier 2 Plaintiffs." *Id.* ¶ 63. To obtain indictments, SAC Love, Officers Stover and Brunk, and others "fabricated, shaped and

'clarified' evidence and testimony, altered records, withheld evidence, and gave false testimony" before the grand jury, "[u]nder the direction, guidance and control" of AUSAs Ahmed, Myhre, and Bogden. *Id.* ¶¶ 39–40.

On February 24, 2015, Special Agent Willis "attempted to 'correct'" Officer Brunk's statement regarding the arrest of Plaintiff Dave Bundy by having him "clarify" that he had not been a spotter/observer for a BLM sniper, despite knowing that Officer Brunk's "prior witness statement was true and correct." *Id.* ¶¶ 41, 42. This attempt to "conceal [the] truth and shroud [Government Employees'] own misconduct" was done at the direction of AUSAs Ahmed, Myhre, and Bogden to "ensure that the [Government Employees'] 'version of events' matched the fabricated record … presented to the grand jury" that Defendant "did not deploy snipers." *Id.* ¶ 42.

On June 29, 2015, AUSA Myhre and Agent Willis "misled the Grand Jury regarding the circumstances surrounding Plaintiff Dave Bundy's April 6, 2014 false arrest" by falsely stating that Dave Bundy had been doing reconnaissance in a closed area despite knowing he was not in a closed area. *Id.* ¶¶ 67–69.

On September 16, 2015, AUSA Ahmed "elicited false and misleading testimony from Officer Stover … regarding the BLM's threat assessments of the Bundy's" while "well-aware that the BLM assessments actually established that the Bundys would not engage in potential acts of violence." *Id.* ¶ 74 (emphasis omitted). On the same day, the grand jury was presented with false testimony that "the operational plan did not include the use of snipers" and that the Bundys and their supporters had "concocted" the purported use of snipers. *Id.* ¶ 75 (emphasis omitted).

On October 14, 2015, "AUSA Myhre purposefully avoided a Grand Juror's question directed at [Defendant's] involvement in the pin removal action and purposefully proffered evasive testimony to avert [ ] SAC Love from disclosing the truth regarding that incident." *Id.* ¶ 65.

On March 2, 2016, AUSAs Ahmed, Myhre, and Bogden "suborned perjurious testimony from Agent Willis," who "falsely claim[ed] that [Plaintiff] Dave Bundy's

vehicle was intended to impede" a government convoy at an intersection at the time of his arrest despite knowing that the vehicle was "lawfully parked more than fifty (50) feet away" from the intersection. *Id.* ¶¶ 71–72. On the same day, the AUSAs "elicited false testimony from [ ] Willis" that Plaintiff Mel Bundy "threatened federal officers" despite knowing "that there was absolutely no evidence of any such threats." *Id.* ¶ 73.

AUSA Ahmed and Officer Stover "also materially misled the Grand Jury regarding [Defendant's]" use of the "First Amendment Zones" by falsely stating that the zones allowed people to view the Cattle Impoundment Operation, were not mandatory, and were as close as possible to the operational area. *Id.* ¶ 76. Officer Stover later admitted that the zones "'were not areas that were appropriate' for citizens to exercise their First Amendment rights." *Id.* ¶ 82. Defendant also used video from the March 28, 2014, "contract cowboy" incident "to intentionally mislead [the] grand jury" by "spinning [the] incident as an example of the Bundys' provocation of the BLM" and "violent response." *Id.* ¶ 46.

"On March 2, 2016, after several months of presenting fabricated, misleading and perjured evidence and testimony to the Grand Jury," Defendant "obtained an indictment against [] Tier 2 Plaintiffs…." *Id.* ¶ 83. The indictment contained "sixteen (16) criminal counts, including, without limitation, conspiracy, conspiracy to impede federal officers, assaulting, threatening, extorting, and obstructing federal officers, and four (4) counts of using firearms in crimes of violence resulting from [the] 'standoff' with [federal] agents … in connection with [Defendant's] Cattle Impoundment Operation." *Id.* ¶ 34. The indictment "was silent as to any basis or probable cause to detain, arrest or otherwise prosecute" Tier 2 Plaintiffs and "deceptively described" Tier 2 Plaintiffs' actual conduct. *Id.* ¶¶ 87–88.

Specifically, the indictment falsely claimed that BLM did not employ snipers or use excessive force during the Operation and that Tier 2 Plaintiffs had used firearms while committing crimes of violence. The indictment "materially misrepresented [Plaintiff] Dave Bundy's actions that ultimately led to his false arrest on April 6, 2014," despite AUSAs Ahmed, Myhre, and Bogden and Special Agent Willis' awareness that Bundy was engaged

in lawful activity at the time of his arrest. *Id.* ¶ 101–03. The indictment further imputed a reporter's question to Plaintiff Mel Bundy and falsely alleged that he had attempted to block a BLM convoy despite the Government Employees' knowledge that he was "at a location well over a mile away." *Id.* ¶¶ 107–10.

**D. Arrest and Litigation of the Underlying Action**

On March 3, 2016, Tier 2 Plaintiffs were arrested in the absence of probable cause pursuant to a warrant issued based on "false, fabricated and manufactured evidence" and without consideration of "withheld exculpatory evidence." *Id.* ¶ 86. Although Plaintiffs "did not engage in any wrongful conduct," they were imprisoned for 23 months, "wrongfully separated from their families, friends and loved ones," "forced to endure [Defendant's] rogue prosecution based upon [] fabricated charges," and unconstitutionally placed on the "No Fly List" and prohibited from purchasing firearms based on their designation as "domestic terrorists." *Id.* ¶¶ 33, 130. Further, throughout their incarceration, "prison guards, at the direction of the [Government Employees], interfered with and ridiculed the Tier 2 Plaintiffs" religious garments. *Id.* ¶ 139. "During the same period of time, Plaintiffs Marylynn Bundy and Briana Bundy were harassed, targeted, [and] repeatedly followed and instigated" by the Government Employees, and the Bundy Family Plaintiffs were forced to endure "stress and mental, physical and emotional anguish," "loss of consortium," "inability … to freely practice their faith," and "financial, occupational and reputational harm." *Id.* ¶ 35.

Despite knowing that the charges against Tier 2 Plaintiffs were false, the Government Employees "attempted to strong-arm the Tier 2 Plaintiffs into accepting a plea," "directed that informants be planted among the Tier 2 Plaintiffs during their incarceration," offered "immediate release from custody" for other inmates to testify falsely against Tier 2 Plaintiffs, and "prepared, instructed, and directed others to prepare fabricated investigative documents for those inmates to sign." *Id.* ¶¶ 52–54.

"In furtherance of [the] conspiracy to keep the Tier 2 Plaintiffs falsely imprisoned," AUSAs Ahmed, Myhre, and Bogden argued to the court in the Underlying Action that Tier

2 Plaintiffs "were the most dangerous, violent criminals in the history of Nevada" despite their own internal threat assessments demonstrating that Tier 2 Plaintiffs were not dangerous or violent. *Id.* ¶¶ 111–12. AUSAs Ahmed, Myhre, and Bogden further misled the court by representing: (1) that Defendant Mel Bundy brought his children to the standoff despite knowing that the children "were located many miles away in another state"; and (2) that the FBI was not involved in the matter despite knowing of the FBI's active involvement. *Id.* ¶¶ 113–16.

The Government Employees also "conspired with one another to conceal" and damage or destroy exculpatory evidence from the defendants in the Underlying Action, including "Dave Bundy's iPad, the BLM threat assessments, the [Government Employees'] use of snipers," and "extensive exculpatory photographic and video-surveillance documentation." *Id.* ¶¶ 89, 105, 116.

"In early February 2017, during the first trial of the Tier 3 defendants," BLM Special Agent Larry Wooten confronted AUSAs Ahmed, Myhre, and Bogden with concerns that they had not properly disclosed exculpatory evidence to the defendants. *Id.* ¶¶ 117–18. "Fearing that [Wooten] would reveal the nature and extent of the … conspiracy …, AUSA Myhre retaliated by abruptly removing [ ] Wooten from … any further involvement in the case" and by raiding his office and seizing his papers and files. *Id.* ¶¶ 119–20. After conferring with his superiors and ethics officials and offices—"each of whom ignored [ ] Wooten's concerns"—Wooten "submitted a whistleblower complaint to the DOJ Associate Deputy Attorney General and National Criminal Discovery Coordinator … to expose the [Government Employees'] egregious conduct, including … the non-disclosure of exculpatory evidence and other *Brady* violations."[3] *Id.* ¶ 122.

---

[3] The contents of the whistleblower complaint are alleged at length in the Complaint. (*See* ECF No. 1 ¶ 124.)

In October 2017, defense lawyers for the Tier 1 defendants expressed concern to the court "regarding missing documents and other evidence that had not been produced or otherwise disclosed" by Defendant, but "was known to exist." *Id.* ¶ 125. At a subsequent evidentiary hearing on January 8, 2018, "numerous *Brady* violations were discovered," including the intentional withholding of exculpatory evidence regarding Tier 2 Plaintiffs.[4] *Id.* ¶ 126. "Due to prosecutorial misconduct, including … the intentional suppression of exculpatory evidence confirming … the innocence of the Tier 2 Plaintiffs, along with [Defendant's] knowing and intentional use of fabricated evidence to secure indictments against them," the case against the Tier 1 defendants was dismissed. *Id.* ¶ 7 n.1. On February 7, 2018,[5] all charges against the Tier 2 group were likewise dismissed on Defendant's own motion. *Id.* ¶¶ 7 n.1, 128.

### E. Exhaustion of Administrative Remedies and Claims

Plaintiffs submitted their federal tort claims to Defendant and its agencies, including the DOJ FTCA Section, on or about February 3, 2020. The FTCA Section acknowledged receipt but did not act on Plaintiffs' claims within six months.

### F. Claims Alleged

Plaintiffs each bring claims against Defendant pursuant to the Federal Tort Claims Act. The Complaint also names as Defendants Does 1-100 and Roes 1-100, unknown entities—"whether individual, corporate, associate, governmental or otherwise"—that "caused acts and events to occur within this forum from which [Plaintiffs'] claims arose." *Id.* ¶ 18. Plaintiffs allege that Defendant is liable for the following torts under Nevada law: (1) false arrest; (2) false imprisonment; (3) malicious prosecution; (4) intentional infliction

---

[4] Numerous excerpts from the transcript of the evidentiary hearing are alleged in the Complaint. (ECF No. 1 ¶ 127.)

[5] Paragraph 128 of the Complaint states that the charges were dropped on February 7, 2019. However, the 2019 date appears to be a typographical error given the other allegations in the Complaint. (*See, e.g.*, ECF No. 1 ¶ 33 (stating that Tier 2 Plaintiffs were imprisoned for 23 months).)

2:22-cv-01039-WQH-EJY

of emotional distress ("IIED"); and (5) loss of consortium. Plaintiffs request damages, attorneys' fees and costs, interest, and all further relief "the Court may deem just and equitable." *Id.* at 44.

## III.   CONTENTIONS

In its Motion to Dismiss, Defendant requests dismissal of Plaintiffs' claims for lack of subject matter jurisdiction and/or failure to state a claim on the following grounds. First, Defendant contends that any claims against the Doe and Roe Defendants should be dismissed because "[t]he remedy against [Defendant United States of America] under the FTCA is exclusive of any other civil action or proceeding for money damages." (ECF No. 26 at 7 (quotation omitted).) Second, Defendant contends that the claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution should be dismissed to the extent that they are based on the conduct of AUSAs Ahmed, Myhre, and Bogden because they were not "investigative or law enforcement officers," and "[t]here is no FTCA jurisdiction over these three common law torts concerning the actions of Federal employees who were not such officers." *Id.* at 11. Third, Defendant contends that Plaintiffs may not seek damages arising from the reputational harm of being branded domestic terrorists because the allegations supporting the requested relief do not comply with the applicable pleading standard and because "libel and slander are explicitly exempted from FTCA coverage." *Id.* at 12. Fourth, Defendant contends that the claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution should be dismissed because the Complaint fails to adequately allege a lack of probable cause. Fifth, Defendant contends that the claims arising out of the IIED and loss of consortium torts should be dismissed because Defendant's alleged conduct "does not meet the threshold of extreme and outrageous as it has been described by the Supreme Court of Nevada," *id.* at 19, and these torts are derivative of the other inadequately-pleaded tort claims. Sixth, Defendant contends that Plaintiffs' claims are barred by the two-year statute of limitations.

In their Response,[6] Plaintiffs request that the Court permit "considerable discovery" before ruling on the Motion to Dismiss because "Plaintiffs are unable to fully respond thereto" until "the entire record from the Underlying Action is produced and Plaintiffs have the opportunity" to complete the requested discovery. (ECF No. 35 at 3.) In the alternative, Plaintiffs contend: (1) the dismissal of the charges against Tier 2 Plaintiffs in the Underlying Action "prohibits [Defendant] from re-litigating or challenging those matters," *id.* at 6; (2) the conduct of the AUSAs can form the basis for Plaintiffs' claims because their tactics had no legitimate policy rationale and they assumed the role of investigators; (3) Defendant's jurisdictional challenge concerning probable cause is "inextricably intertwined with, and dependent upon, a resolution of the merits of Plaintiffs' FTCA claims," *id.* at 8; (4) the Complaint adequately alleges facts to support the absence of probable cause; and (5) Plaintiffs' claims were timely filed.[7] Plaintiffs concede that dismissal of the Doe and Roe Defendants is appropriate. *Id.* at 13 n.11. Plaintiffs agree that "their references for libel or slander based upon their placement and maintenance on 'no fly lists' and 'prohibited persons listed for purchasing firearms' should also be dismissed" as precluded under the FTCA. *Id.*

In its Reply, Defendant contends that discovery is inappropriate for a number of reasons, including that: (1) Plaintiffs already possess an "extensive, detailed factual record"

---

[6] Plaintiffs' Response and Defendant's Reply address Defendant's Motions to Dismiss in this action and a related action, *Engel v. United States*, 22-cv-1040-WQH-EJY. These cases have not been consolidated and remain separate actions. In this Order, the Court only addresses the arguments relevant to this action.

[7] Plaintiffs request judicial notice of "various publicly-filed documents in the Underlying Action and related appeals before the Ninth Circuit Court of Appeals," which are "referenced in or otherwise attached to the supporting Declarations of [Craig A. Marquiz] and Warren Markowitz, Esq." (ECF No. 35 at 3.) However, Plaintiffs do not specify the documents for which they request judicial notice, nor do they state the grounds upon which their requests are based. *See* Fed. R. Evid. 20(c)(2) (stating that judicial notice is appropriate upon such a request and the Court "is supplied with the necessary information"). Additionally, the Court declines to take judicial notice of all documents attached to Plaintiffs' Response because the Court need not consider these documents at this time given the rulings stated herein. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1010 n. 12 (9th Cir. 2009) (denying request for judicial notice where judicial notice would be "unnecessary").

(ECF No. 46 at 2); (2) "[t]he bulk of [Defendant's] motion[] is premised on [Federal Rule of Civil Procedure] 12(b)(6), for which [Defendant] assumed the truth of Plaintiffs' factual allegations" (ECF No. 46 at 2); (3) Plaintiffs have not identified any prejudice; (4) Plaintiffs hold the burden of establishing jurisdiction; (5) the secret grand jury materials are not relevant to Defendant's Motion; (6) the legal authority cited by Plaintiffs for permitting discovery does not apply to motions to dismiss; and (7) Plaintiffs do not provide the Court with the specific facts they are deprived of that prevent them from responding to the Motion to Dismiss. Defendant contends that Plaintiffs conflate the issue of whether AUSAs are considered investigative or law enforcement officers—a "simple issue of statutory interpretation"—with the constitutional doctrine of prosecutorial immunity. *Id.* at 11. Defendant contends that its challenge to the Complaint on the basis of Plaintiffs' failure to adequately allege a lack of probable cause is a challenge "directly on the merits" and thus does not implicate Plaintiffs' jurisdictional arguments. *Id.* at 10.

## IV.   LEGAL STANDARDS

### A. Dismissal for Lack of Jurisdiction

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move for dismissal on the basis that the court lacks jurisdiction over the subject matter of the action. The burden is on the plaintiff to establish that the court has subject matter jurisdiction over the action. *Assoc. of Med. Colls. v. United States*, 217 F.3d 770, 778–79 (9th Cir. 2000). Rule 12(b)(1) is a "proper vehicle for invoking sovereign immunity from suit." *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015).

A Rule 12(b)(1) jurisdictional attack may be facial or factual. "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* "In resolving a factual attack on jurisdiction, the district court may review evidence beyond

the complaint without converting the motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness of the plaintiff's allegations." *Id.*

**B. Dismissal for Failure to State a Claim**

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to state a claim for relief, a pleading "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting Fed. R. Civ. P. 8(a)). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

/ / /

/ / /

/ / /

2:22-cv-01039-WQH-EJY

# V. DISCUSSION

## A. Request for Discovery

Plaintiffs request that the Court permit them to engage in discovery prior to ruling on Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 56(d). Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

However, as a threshold matter, Plaintiffs have not identified any legal authority supporting the proposition that Rule 56(d) applies to parties requesting discovery prior to consideration of a motion to dismiss. District courts in this Circuit to have considered this issue have concluded that Rule 56(d) does not apply to motions to dismiss. *See, e.g.*, *Wood v. Panther*, No. 1:15-cv-00092-DCN, 2021 WL 851651, at *2 (D. Idaho Mar. 4, 2021) ("This provision does not apply when a plaintiff does not even state a viable claim in the first place. Indeed, such a claim does not make it to discovery, let alone provide a basis for more time to engage in discovery."); *Martin v. James River Ins. Co.*, 366 F. Supp. 3d 1186, 1189 (D. Nev. 2019) ("Rule 56(d) applies to summary judgment, not dismissal.").

While Rule 56(d) does not apply to motions to dismiss, "[a] motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6) must be treated as a motion for summary judgment under Federal Rule of Civil Procedure 56 if either party to the motion to dismiss submits materials outside the pleadings in support or opposition to the motion, and if the district court relies on those materials." *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996); *see also* Fed. R. Civ. P. 12(d). However, conversion of Defendant's Motion to Dismiss into a motion for summary judgment is not appropriate in this case because the parties do not submit, and the Court does not consider, any extrinsic evidence that is not

16

properly subject to judicial notice.[8] *See* Fed. R. Civ. P. 12(d); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment." (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986))).

Discovery may alternatively be permissible to rebut a factual attack on jurisdiction. *See St. Clair v. City of Chico*, 880 F.2d 199, 201–02 (9th Cir. 1989). However, the Court concludes that Defendant's jurisdictional challenges are properly considered facial challenges rather than factual challenges because Defendant does not rely on any non-judicially noticeable extrinsic evidence to demonstrate the absence of jurisdiction.[9] *See Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017) (stating that a court may take judicial notice of matters of public record in reviewing a facial attack on jurisdiction); *Safe Air for Everyone*, 373 F.3d at 1039 (stating that a moving party can convert a facial attack into a factual attack "by presenting affidavits or other evidence"). Further, even if Defendant had raised a factual challenge to jurisdiction, the discovery requested by Plaintiffs concerns Defendant's alleged lack of probable cause to indict, arrest, and prosecute the Tier 2 Plaintiffs. Because the issue of whether Defendant lacked probable cause is an element of Plaintiffs' false arrest, false imprisonment, and malicious prosecution claims rather than a jurisdictional prerequisite under the FTCA,[10] *see Leeson v. Transamerica Disability*

---

[8] Neither party has requested that the Court convert the Motion to Dismiss into a motion for summary judgment.

[9] Defendant describes its jurisdictional challenges as, at least in part, factual, but the Court does not find this characterization to be controlling. (*See* ECF No. 26 at 3 ("The United States asserts a lack of jurisdiction here on a factual basis, not solely a facial one.").)

[10] Defendant's briefing makes clear that the probable cause issue is intended to be raised pursuant to Rule 12(b)(6), not Rule 12(b)(1). (*See, e.g.*, ECF No. 46 at 10 ("The United States' primary argument in its Motions to Dismiss relies on Rule 12(b)(6) and the *Iqbal* standard…. Plaintiffs' theories for false arrest, false imprisonment, and malicious prosecution fail because they have failed to articulate a plausible factual scenario where the Government wholly lacked probable cause or any legal justification to arrest and indict the indicted Plaintiffs…. This challenge by the United States is directly on the merits of Plaintiffs' claims….").)

*Income Plan*, 671 F.3d 969, 971 (9th Cir. 2012) (distinguishing between substantive elements of a claim and prerequisites for subject matter jurisdiction), this discovery would not be relevant to resolving Defendant's jurisdictional challenges, *see St. Clair*, 880 F.2d at 202 (rejecting request for jurisdictional discovery that "would be useless"). Plaintiffs' request for discovery prior to the Court's consideration of Defendant's Motion to Dismiss is denied.

**B. Doe and Roe Defendants**

Defendant contends that any claims against the Doe and Roe Defendants should be dismissed for lack of subject matter jurisdiction because "[t]he remedy against [Defendant United States of America] under the FTCA is exclusive of any other civil action or proceeding for money damages." (ECF No. 26 at 7 (quotation omitted).) Plaintiffs "agree" that dismissal of the Doe and Roe Defendants is appropriate. (ECF No. 35 at 13 n.11.) Accordingly, the Court dismisses Plaintiffs' claims against the Doe and Roe Defendants for lack of jurisdiction.

**C. Investigative or Law Enforcement Officer Exception**

In its Motion to Dismiss, Defendant contends that Plaintiffs' FTCA claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution should be dismissed for lack of jurisdiction to the extent that they are based on the conduct of AUSAs Ahmed, Myhre, and Bogden because the AUSAs were not "investigative or law enforcement officers," and "[t]here is no FTCA jurisdiction over these three common law torts concerning the actions of Federal employees who were not such officers." (ECF No. 26 at 11.) In their Response, Plaintiffs contend that liability for false arrest, false imprisonment, and malicious prosecution can be premised on the conduct of the AUSAs because the tactics employed by the AUSAs had "no legitimate policy rationale" and the AUSAs each "assumed the role of an investigator." (ECF No. 35 at 22–23.) In its Reply, Defendant contends that "Plaintiff[s] conflate[] this simple issue of statutory interpretation with the constitutional doctrine of absolute immunity against state and local prosecutors." (ECF No. 46 at 11.)

28 U.S.C. § 2680 bars FTCA claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights" unless such claims are "with regard to acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). The statute further defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.*

Federal courts interpreting this provision have universally concluded that federal prosecutors are not "investigative or law enforcement officers" because they are not empowered to execute searches, seize evidence, or make arrests. *See* 28 U.S.C. § 547 (setting out the duties of United States Attorneys); *see Manansingh v. United States*, No. 21-16192, 2023 WL 2658753, at *2 (9th Cir. Mar. 28, 2023) ("For purposes of this provision, the term 'investigative or law enforcement officer' means 'any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.' Federal prosecutors do not qualify as investigative or law enforcement officers here." (citations omitted) (quoting *Wright v. United States*, 719 F.2d 1032, 1034 (9th Cir. 1983))); *Lozada-Manzano v. United States*, 75 F.4th 31, 38 (1st Cir. 2023) ("Federal prosecutors do not fall within this definition, and so their actions cannot provide the basis for malicious prosecution actions under the FTCA."); *Moore v. United States*, 213 F.3d 705, 710 (D.C. Cir. 2000) (concluding that an AUSA's conduct could not "be the basis for a malicious prosecution claim against the government because [the AUSA was] not an investigative or law enforcement officer"); *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994) ("The FTCA authorizes suits for abuse of process based only on the actions of federal investigative or law enforcement officers, not on the actions of government prosecutors."); *Cox v. United States*, No. SACV 16-01222-CJC (KES), 2016 WL 11518805, at *6 n.17 (C.D. Cal. Aug. 16, 2016) ("An AUSA is not an investigative or law enforcement officer under this subsection."). Further, expanding the definition of "investigative or law enforcement officers" to include any prosecutors who

exceeded their lawful authority by assuming the role of investigators is not supported by the statutory language in § 2680, which is squarely focused on the legal powers possessed by the individuals at issue rather than such individuals' alleged conduct. *See Vander Zee v. Reno*, No. 95-50482, 1996 WL 625346, at *4 n.2 (5th Cir. 1996) ("Vander Zee suggests in his First Amended Complaint that the United States Attorneys should be considered 'law enforcement officers' by virtue of the control which they exercised over the actions of agents of the FBI. However, those courts that have considered the question have concluded that prosecuting attorneys are not 'law enforcement officers' within the meaning of [§ 2680(h)].… We agree." (citations omitted)); *see also Lane v. Pena*, 518 U.S. 187, 192 (1996) ("[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." (citing *United States v. Williams*, 514 U.S. 527 (1995) (when confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will "constru[e] ambiguities in favor of immunity"))).

In support of their contrary position, Plaintiffs primarily rely on *Myles v. United States*, 47 F.4th 1005 (9th Cir. 2022). *Myles* held that the discretionary function exception did not shield the government from liability for a malicious prosecution claim based on the conduct of a Department of Homeland Security ("DHS") agent tasked with investigating workplace misconduct who allegedly lied under oath, tampered with witnesses, and fabricated evidence. In support of this conclusion, the court noted that applying the discretionary function exception in the case "would thereby render … section 2680(h) meaningless" because "it is hard to imagine any malicious prosecution action covered by the section 2680(h) carve-out" for liability based on the actions of investigative or law enforcement officers "that would survive application of the discretionary function exception." *Id.* at 1013.

Because it was undisputed that the DHS investigator at issue in *Myles* was an "investigative or law enforcement officer," *Myles* did not have occasion to address the interpretation of that term or the applicability of § 2680(h) as applied to AUSAs or other prosecuting attorneys. *Myles* instead assumed that the DHS investigator was an

2:22-cv-01039-WQH-EJY

"investigative or law enforcement officer" and held that the government's liability for his misconduct under § 2680 could not be obviated through reliance on the discretionary function exception. *See id.* at 1014 ("In sum, we conclude that in malicious prosecution cases in which the plaintiff alleges that an investigative or law enforcement official fabricated evidence, tampered with witnesses, lied under oath, or otherwise knowingly offered false testimony to induce criminal charges against the plaintiff, the discretionary function exception does not shield the United States government from liability…."). *Myles'* analysis concerning the discretionary function exception is inapplicable in this case because, as a threshold matter, the AUSAs at issue are not "investigative or law enforcement officers" like the DHS investigator. *See id.* at 1013 (noting that the discretionary function exception and § 2680 "should not be read as coextensive"). Similarly, while absolute immunity does not protect a prosecutor who assumes the role of an investigator under the common law, *see Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976), the absence of general common-law prosecutorial immunity does not negate the specific exception to FTCA liability provided by § 2680.

At oral argument, Plaintiffs cited to two cases, *Cao v. United States*, 156 Fed. App'x 48 (2005), and *Gonzalez v. United States*, No. CV-12-01912 DMG (DTBx), 2013 WL 942363 (C.D. Cal. Mar. 11, 2013). Neither case supports Plaintiffs' position. In *Cao*, the Court of Appeals stated:

> [Cao] sued the INS attorneys prosecuting his case for failing to move to dismiss the removal proceedings in the face of Cao's fervent claims of entitlement to citizenship. Both of these claims fail at the outset because Cao has not established that either the immigration judge or the INS attorneys are investigative or law enforcement officers under § 2680(h)…. Thus, the actions of the IJ and INS attorneys in this case cannot from the basis of United States' tort liability.

*Cao*, 156 Fed. App'x at 50 (citations omitted). Similarly, in *Gonzalez*, the court stated: "Plaintiff's claims relate exclusively to the decisions to prolong immigration custody, to administratively close removal proceedings, and to continue removal hearings, all of which

are reserved for Immigration Judges and DHS attorneys who are not 'law enforcement officers' within the meaning of Section 2680(h)." *Gonzalez*, 2013 WL 942363, at *5.

The Court concludes that it lacks jurisdiction over Plaintiffs' FTCA claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution to the extent that such torts are based on the actions of AUSAs Ahmed, Myhre, and Bogden because Plaintiffs have failed to show or adequately allege that the AUSAs were "investigative or law enforcement officers." 28 U.S.C. § 2680(h).

Accordingly, to the extent the Complaint alleges FTCA claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution based on the actions of AUSAs, the Motion to Dismiss is granted pursuant to Federal Rule of Civil Procedure 12(b)(1).

### D. Lack of Probable Cause – False Arrest, False Imprisonment, and Malicious Prosecution Claims

Defendant contends that with respect to the false arrest, false imprisonment, and malicious prosecution claims, Plaintiffs fail to allege a lack of probable cause, which is a required element for all three causes of action under Nevada law. Defendant contends that the Complaint includes "six allegations of false statements to the Grand Jury," but "the Complaint does not explain how these six alleged falsehoods wrongly convinced the Grand Jury that probable cause existed to charge them on multiple counts for violation of nine statutes." (ECF No. 26 at 15–16.) Defendant contends that the statements contained in the Complaint from "Judge Navarro's order concerning *Brady* violations by the prosecution for not disclosing potentially exculpatory evidence has [nothing] to do with whether the Grand Jury could find probable cause." *Id.* at 17. Alternatively, Defendant contends that "a grand jury indictment creates a presumption of probable cause." *Id.* at 18. Defendant contends that because "Plaintiffs have failed to allege facts that could possibly establish a necessary element of the false arrest, false imprisonment, and malicious prosecution claims, Plaintiffs' FTCA claims for false arrest, false imprisonment, and malicious prosecution fail to state a claim and should be dismissed." *Id.* at 19.

Plaintiffs contend that the required elements to validly state cause of actions for false arrest, false imprisonment, and malicious prosecution "have been irrefutably identified, along with factual averments." (ECF No. 35 at 15–16.) With respect to the false arrest and false imprisonment claims, Plaintiffs do not specifically address probable cause. *See id.* at 15–16 nn.14, 15. In addressing the requirements for a malicious prosecution claim, Plaintiffs contend they allege in the Complaint that "the Government Defendants' fabrication of evidence, elicitation and providing of perjurious testimony, along with the egregious withholding and destruction of exculpatory evidence so that they could wrongfully secure Grand Jury Indictments and arrest warrants against Joseph O'Shaughnessy, Jason Woods, Mel Bundy, Dave Bundy and Todd Engel establishes the absence of probable cause," in addition to "the malicious intent of said Government Employees' conduct." *Id.* at 16 n.16. Plaintiffs contend the presumption of probable cause by a grand jury indictment can be rebutted by a showing that the criminal prosecution was induced by fraud, perjury, fabricated evidence, or bad faith, wrongful conduct. *Id.* at 20. Plaintiffs contend that this issue should not be resolved at this stage of the proceedings and is best left for resolution at the summary judgment stage after discovery.

Under Nevada law,[11] claims for malicious prosecution, false arrest, and false imprisonment require the plaintiff to show that the defendants lacked probable cause. *See Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 121 Nev. 44, 69 (2005), *abrogated on other grounds by Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 227 (2008); *LaMantia v. Redisi*, 118 Nev. 27, 30 (2002); *see also Fayer v. Vaughan*, 649 F.3d 1061, 1064 (9th Cir. 2011). A grand jury indictment creates a rebuttable presumption of probable cause, which can be overcome by allegations of "false testimony or suppressed facts." *Jordan*, 121 Nev. at 70 n.65 (quoting *Ricord v. Cent. Pac. RR. Co.*, 15 Nev. 167,

---

[11] The parties agree that the substantive law of Nevada applies to causes of action in this case. (*See* ECF No. 26 at 14; ECF No. 35 at 15–16 & nn.14–16.)

180 (1880); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004)); *see also Awabdy*, 368 F.3d at 1067 ("Among the ways that a plaintiff can rebut a *prima facie* finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."); *Manansingh*, 2023 WL 2658753, at *3 (reversing district court's dismissal of the plaintiffs' malicious prosecution claim because the plaintiffs "alleged that Manasingh's prosecution rested on fabricated evidence and that the prosecution withheld exculpatory evidence, which rebuts a finding of probable cause" (citing *Awabdy*, 368 F.3d at 1066–68)).

In the present case, Plaintiffs have alleged that Defendant Employees[12] intentionally fabricated evidence and testimony, altered records, purposefully excluded or suppressed exculpatory evidence, and gave false testimony to obtain grand jury indictments to prosecute and convict Plaintiffs. (*See, e.g.*, ECF No. 1 ¶¶ 40–42, 47, 53–54, 58–63, 71–76, 80–81, 89–91, 104, 107, 109, 125, 143.) At this stage in the proceedings, the Court finds that Plaintiffs' Complaint adequately alleges the lack of probable cause element for their malicious prosecution, false arrest, and false imprisonment claims. *See Awabdy*, 368 F.3d at 1067; *see also Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002) (stating that the Court of Appeals for the Ninth Circuit has "explained that the presumption of independent prosecutorial judgment in the charging decision is an evidentiary presumption applicable at the summary judgment stage...; it is not a pleading requirement to be applied to a motion to dismiss"). The Court denies Defendant's Motion to Dismiss the false arrest, false imprisonment, and malicious prosecution claims based on pleading the element of a lack of probable cause.

/ / /

/ / /

---

[12] As the Court finds above, only the allegations related to non-AUSA federal employee conduct may form the basis of the false arrest, false imprisonment, and malicious prosecution claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E. Loss of Consortium Claim**

Defendant contends that Plaintiffs fail to "allege facts that could possibly establish a necessary element of the false arrest, false imprisonment, and malicious prosecution claims," and "[b]ecause the Loss of Consortium claim can only be proven if the underlying tort can be proven, it must too be dismissed." (ECF No. 26 at 19, 21.)

The only ground upon which Defendant moves to dismiss the loss of consortium claims is that Plaintiffs fail to adequately allege the underlying torts of malicious prosecution, false arrest, and false imprisonment. However, the Court finds above that Plaintiffs have sufficiently alleged a lack of probable cause and the causes of action for malicious prosecution, false arrest, and false imprisonment are sufficient to survive at this stage of the proceedings. Accordingly, Defendant's Motion to Dismiss the loss of consortium claims is denied.

**F. Intentional Infliction of Emotional Distress Claims**

Defendant contends that Plaintiffs' IIED claims fail because the alleged conduct "does not meet the threshold of extreme and outrageous as it has been described by the Supreme Court of Nevada." (ECF No. 26 at 19.) Defendant contends that "[t]he only fair reading of the Complaint is that [Plaintiffs] believe that FBI employees, BLM employees, and AUSAs engaged in unspecified 'fabrications' and these fabrications automatically support a legal claim for 'extreme and outrageous conduct'" under Nevada law. *Id.* at 20. Defendant contends that because Plaintiffs "fail to identify a lack of probable cause, they have also failed to do so for the purposes of the IIED claim." *Id.*; *see also* ECF No. 46 at 11.

Plaintiffs contend that additional discovery is necessary in order to respond to Defendant's Motion and state that they "have affirmatively alleged that the Government Employee's conduct … [was] extreme and outrageous and accomplished with the intent, or reckless disregard for, causing Plaintiffs' emotional distress." (ECF No. 35 at 14 n.18.) Plaintiffs contend that "the District Court [in the criminal case] has already determined that the Government's conduct was 'outrageous,' willful and intentional." *Id.*

In order to establish a cause of action for IIED under Nevada law, a plaintiff must show: "(1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation." *Miller v. Jones*, 114 Nev. 1291, 1299–1300 (1998). "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 4 (1998) (quotations and citation omitted). "Extreme and outrageous conduct also may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Chehade Refai v. Lazaro*, 614 F. Supp. 1103, 1122 (D. Nev. 2009) (quotation omitted) (quoting restatement).

In this case, to the extent that Defendant moves to dismiss the IIED claims based upon its argument regarding lack of probable cause, the Court finds above that the Complaint plausibly alleges a lack of probable cause. The Court denies Defendant's Motion to Dismiss on this basis. In the Complaint, Plaintiffs allege that Defendant Employees' conduct—which Plaintiffs allege throughout the Complaint includes fabrication of evidence, perjured testimony, altered records, and purposefully excluded evidence to obtain grand jury indictments—was "extreme and outrageous." The Court finds that Plaintiffs have plausibly alleged claims for IIED at this stage of the proceedings. *See, e.g.*, *Lobato v. Las Vegas Metro. Police Dep't*, No. 2:19-cv-01273-RFB-EJY, 2022 WL 4017055, at *15 (D. Nev. Sept. 1, 2022) (denying summary judgment on an IIED claim when a triable issue of fact existed concerning alleged fabricated evidence the defendants used against the plaintiff), *reversed and remanded in part on other grounds*, No. 22-16440, 2023 WL 6620306 (9th Cir. Oct. 11, 2023); *Woods v. City of Reno*, No. 3:16-cv-00494-MMD-DJA, 2020 WL 4194844, at *15 (D. Nev. July 21, 2020) (same). Defendant's Motion to Dismiss Plaintiffs' IIED claims is denied.

/ / /

/ / /

1

**G. Statute of Limitations**

2

Defendant contends that "all events [alleged in the Complaint] were more than two

3

years before the SF-95 claims were filed," thereby falling outside the FTCA's two-year

4

statute of limitations and raising a "jurisdictional" issue. (ECF No. 26 at 8.) Defendant

5

contends that even if the statute of limitations was tolled during the Tier 2 Plaintiffs' period

6

of incarceration, factual allegations concerning events that occurred before the Tier 2

7

Plaintiffs were incarcerated are still time-barred.

8

Plaintiffs contend that their claims are not time-barred because the claims did not

9

accrue until after the Tier 2 Plaintiffs were released from custody and that Plaintiffs' claims

10

"were equitably tolled" "[d]uring the pendency of the prior action and during [Plaintiffs']

11

exhaustion of administrative remedies period." (ECF No. 35 at 14.)

12

"A claim may be dismissed [for failure to state a claim] on the ground that it is barred

13

by the applicable statute of limitations only when 'the running of the statute is apparent on

14

the face of the complaint.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592

15

F.3d 954, 969 (9th Cir. 2010) (quoting *Huynh v. Chase Manhattan Bank*, 465 F.3d 992,

16

997 (9th Cir. 2006)). "A complaint cannot be dismissed unless it appears beyond doubt that

17

the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Id.*

18

(quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)).

19

The FTCA's statute of limitations provides: "A tort claim against the United States

20

shall be forever barred unless it is presented in writing to the appropriate Federal agency

21

within two years after such claim accrues...." 28 U.S.C. § 2401(b).[13] This provision is "a

22

nonjurisdictional claim-processing rule subject to the presumption in favor of equitable

23

tolling." *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1047 (9th Cir. 2013). Because § 2401(b)

24

is not jurisdictional, the Court analyzes this issue under the standards applicable to motions

25

26

27

[13] Defendant also cites Nevada's statute of limitations. However, "the FTCA's timing provisions act as a statute of limitations that supersedes any state statute of limitations." *Bennett v. United States*, 44 F.4th 929, 931 (9th Cir. 2022).

28

under Rule 12(b)(6). The Court confines its analysis to the arguments raised by Defendant in the Motion to Dismiss with respect to the statute of limitations and whether any claim accrued prior to the filing of the administrative claims.

The Complaint alleges that Plaintiffs submitted their federal tort claims to Defendant and its agencies on or about February 3, 2020. Accordingly, in the absence of tolling, any claims alleged in the Complaint that accrued prior to February 3, 2018, are subject to dismissal.

In the Complaint, Plaintiffs do not allege that equitable tolling applies to any claim and raise an equitable tolling argument for the first time in their Response. In discussing equitable tolling in their Response, Plaintiffs only contend that the statute of limitations period is equitably tolled during the pendency of the prior action and period of administrative remedies exhaustion, which all occurred after February 3, 2018—the date of the filing of the administrative claims. Plaintiffs have not adequately alleged in the Complaint or argued in Response a plausible basis to equitably toll any claim having accrued prior to February 3, 2018. Thus, in order to determine whether the statute of limitations bars any of Plaintiffs' claims, the Court must determine whether the dates on which Plaintiffs' claims accrued was prior to February 3, 2018.

An FTCA claim accrues when the plaintiff has a complete cause of action and "knows or has reason to know of the injury which is the basis of his action." *Hensley v. United States*, 531 F.3d 1052, 1056 (9th Cir. 2008); *see also Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Bartleson v. United States*, 96 F.3d 1270, 1276 (9th Cir. 1996) ("The date on which an FTCA claim accrues is determined by federal law.").

### 1. Malicious Prosecution Claims

A malicious prosecution claim does not accrue until the underlying criminal proceedings have been terminated in the plaintiff's favor. *Heck v. Humphrey*, 512 U.S. 477, 484 (1994). In the Complaint, Plaintiffs allege that the prosecution of the Tier 2 Plaintiffs

terminated on February 7, 2018,[14] which falls within two years of the date the administrative claims were filed. Plaintiffs' malicious prosecution claims are timely.

### 2. False Arrest and False Imprisonment Claims

False imprisonment and false arrest claims accrue when the plaintiff becomes held pursuant to legal process. *Wallace*, 549 U.S. at 389; *see id.* (stating that a false arrest claim requires "detention without legal process"). The Complaint alleges the Tier 2 Plaintiffs were arrested on March 3, 2016, after indictment. (*See* ECF No. 1 ¶¶ 33, 83, 86.) The Complaint alleges that Plaintiff Dave Bundy was first arrested on April 6, 2014, and released from custody the following day. (ECF No. 1 ¶¶ 101, 106.) Based upon the allegations of the Complaint, Plaintiffs' claims for false arrest and false imprisonment accrued far before February 3, 2018. *See Wallace*, 549 U.S. at 390 ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." (citation omitted)). The Court finds that, based upon the allegations of the Complaint, the false arrest and false imprisonment claims are not timely. Accordingly, the Motion to Dismiss the false arrest and false imprisonment claims is granted.

### 3. Intentional Infliction of Emotional Distress Claims

With respect to the IIED claims, it is unclear from the Complaint when the Tier 2 Plaintiffs became aware of their injuries due to Defendant Employees' conduct. Moreover, based upon the allegations of the Complaint, the Court cannot conclude at this stage in the proceedings that the IIED claims accrued prior to February 3, 2018, given the potential applicability of the continuing torts doctrine. *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th

---

[14] As the Court previously stated, the Complaint contains a typographical error as to the date the criminal proceedings against the Tier 2 Plaintiffs were terminated. The Complaint states "February 7, 2019," (ECF No. 1 ¶ 128), while Plaintiffs contend in Response that the date was February 7, 2018 (ECF No. 35 at 14). Upon reviewing the motion dismissing the indictment with prejudice, the correct date is February 7, 2018 (ECF No. 35-27). *See Lee*, 250 F.3d at 689 (stating that a court may take judicial notice of "'matters of public record' without converting a motion to dismiss into a motion for summary judgment").

Cir. 2002) ("When a tort involves continuing wrongful conduct, the statute of limitations doesn't begin to run until that conduct ends."). Defendant's Motion to Dismiss the IIED claims as untimely is denied.

### 4. Loss of Consortium Claims

Because the Bundy Family Plaintiffs' loss of consortium claims are derivative of Dave Bundy's and Mel Bundy's claims and based upon the Court's rulings above with respect to the malicious prosecution claims and IIED claims, the Court cannot conclude based upon the allegations of the Complaint that the conduct relating to the loss of consortium claims ended prior to February 3, 2018. Defendant's Motion to Dismiss the loss of consortium claims as untimely is denied.

## VI.    CONCLUSION

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss (ECF No. 26) is granted in part and denied in part. Plaintiffs' FTCA claims arising out of the torts of false arrest, false imprisonment, and malicious prosecution are dismissed without prejudice to the extent that such torts are based on the actions of AUSAs Ahmed, Myhre, and Bogden. Plaintiffs' claims for false arrest and false imprisonment based on the actions of non-AUSAs are dismissed without prejudice. Plaintiffs' claims against the Doe and Roe Defendants are dismissed with prejudice. To the extent Plaintiffs assert claims of slander and libel, they are dismissed with prejudice. The remainder of the Motion to Dismiss is denied. The Complaint's claims that remain pending are the malicious prosecution, loss of consortium, and IIED claims with respect to only the alleged actions of the FBI agents and BLM agents and officers.

/ / /

/ / /

/ / /

/ / /

2:22-cv-01039-WQH-EJY

Defendant shall file an answer to the FAC pursuant to Federal Rule of Civil Procedure 12(a). The parties must comply with the Court's January 17, 2023, Order (ECF No. 30) requiring the filing of a status report, if applicable.

IT IS FURTHER ORDERED that the Motion to File Excess Pages (ECF No. 37) is granted.

Dated:  November 20, 2023

Hon. William Q. Hayes
United States District Court

2:22-cv-01039-WQH-EJY